## CITY OF ST. LOUIS v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY et al., Appellants.

Division One, February 28, 1913.

1. **LIMITATIONS: Lands Dedicated to Public Use: Wharfs.** Since August 1, 1866 (G. S. 1865, p. 746, sec. 7, chap. 191, which is still preserved as live law in R. S. 1909, sec. 1886), title could not be acquired by adverse possession to lands given or granted to a public use, and said statute can nowhere be more beneficially applied than in preserving to cities grounds on the banks of navigable rivers for levees, wharfs and water fronts. But title to lands abutting on the river and belonging to the city as a part of its "commons" may have been lost by adverse possession for ten years prior to that date.

2. **ACCRETIONS: Not Included in Deed.** It is the shore owner who is entitled to accretions forming to the shore. Where the city was the owner of lots bounded by the Mississippi River, and an official recorded plat made in 1847 showed a strip or ribbon of shore land between the east boundary line of the lots and the river, and the city in 1853-56 conveyed the lots by the exact quantity named in the plat and referring to the plat for the description, which did not include the strip or ribbon, and there is evidence that said strip was in existence before the plat was made and none that it sprang from accretions after those conveyances were made, the city did not by deed part with the said strip.

3. **LIMITATIONS: Tacking Present Possession to Former Adverse Possession.** The present defendant in possession may tack his possession to the possession of his grantor who was in adverse possession prior to August 1, 1866, when it was allowable to acquire by adverse possession and limitations title to land devoted to a public use.

4. ———: **Continuous Possession, but not Adverse: License.** A railway company which was in continuous open possession of the city's land for ten years prior to August 1, 1866, under a license from the city giving it the privilege of exclusively using said land for the purpose of a dock for forty years, did not have such possession as gave it title by limitations, for the possession was not adverse.

5. ———: **Issue at Law: Burden.** In ejectment, where plaintiff has the paper or record title, the burden is on defendant to show it has acquired that title by deeds or by adverse possession; and the issue being one at law, in either case, and there being evidence to sustain the verdict for plaintiff, or the finding of the court sitting as a jury, the Supreme Court is bound by it.

6. **EVIDENCE: Shifting Objection on Appeal.** Appellant cannot make one objection to proffered evidence at the trial and, finding that untenable, have the evidence excluded on appeal on other grounds. Where defendant in ejectment at the trial objected to the offer of a concession agreement made with its remote grantor for the use of plaintiff's property, that "it is not binding on us," it cannot on appeal be heard to contend that the agreement was *ultra vires*, because of lack of power to execute it.

7. ———: **Commons: Surrender to Private Persons: Ultra Vires.** The strip of ground in suit was not a public street, but a part of the common granted to Carondelet by the United States, and by legislative grants of power that city had authority to sell or lease her commons. Therefore, cases holding that a city has no power to surrender possession of its *de facto* streets to private persons, do not apply.

8. ———: ———: ———: ———: **Estoppel: Adverse Possession: Set up by Beneficiary.** Where defendant's remote grantor got possession of the land in suit by a concession from the city of the privilege to him and his assigns to use it for dock and other like purposes for forty years, and enjoyed the fruits of the concession, it would be bad morals and bad law to hold that said grantor could acquire title by claiming to hold adversely to the city during the life of the concession. A party under a mere *ultra vires* contract may not get and retain benefits thereunder and then turn about and repudiate the contract

**Appeal from St. Louis City Circuit Court.—***Hon.*
*George H. Shields*, Judge.

Affirmed.

St. Louis v. Railroad.

*R. T. Railey* and *James F. Green* for appellants.

(1)   In ejectment plaintiff must recover on the strength of his own title.   St. Louis v. Blast Furnace Co., 235 Mo. 1; Ables v. Webb, 186 Mo. 247; Mann v. Elliott, 99 Mo. 616; Mather v. Walsh, 107 Mo. 121; West v. Bretelle, 115 Mo. 653; Kingman v. Sievers, 143 Mo. 519; Large v. Fisher, 49 Mo. 307.   (2) Defendant railway, as the riparian owner of blocks 66 and 77, was entitled to the accretions, if any, thereto. City v. Railway, 114 Mo. 21; St. Louis v. Blast Furnace Co., 235 Mo. 1.   (3) The contract between Carondelet and Ivory and also ordinance No. 610 were void, and transferred no title to the plaintiff.   Wilkinson v. Dock Co., 102 Mo. 140; City v. Glasgow, 15 Mo. App. 122, 87 Mo. 678; Mathews v. Alexandria, 68 Mo. 115; Schoppe v. St. Louis, 117 Mo. 136; Cole v. Lagrange, 113 U. S. 6; Glaessner v. Brewing Assn., 100 Mo. 515; Knapp, Stout & Co. v. Railroad, 126 Mo. 36; State ex rel. v. Murphy, 134 Mo. 564; City v. Carpenter, 13 Cal. 545.   (4) The evidence also establishes title to the property in controversy in the defendant railway by adverse possession.   Hendrickson v. Grable, 157 Mo. 42; School v. Goerges, 50 Mo. 194; Dice v. Hamilton, 178 Mo. 89; Coleman v. Drane, 116 Mo. 389; Ins. Co. v. St. Louis, 98 Mo. 424.

*Lambert E. Walther* and *Henry W. Allen* for respondent.

(1)   An action for the recovery of possession of land may be maintained against any person not having a better title thereto, in all cases where the plaintiff claims possession thereof under or by virtue of a confirmation made under the laws of the United States. R. S. 1909, sec. 2383; Janis v. Gurno, 4 Mo. 458.   (2) The Act of June 13, 1812 (2 U. S. Stat. at Large, 748), and the Supplementary Acts of May 26, 1824 (4 U. S. Stat. at Large, 65), and of January 27, 1831 (U. S.

Stat. at Large, 435), operated *ex proprio vigore* to divest the title of the land designated therein out of the United States and to vest it in the inhabitants of the village of Carondelet.  Carondelet v. St. Louis, 25 Mo. 459; Vasseur v. Benton, 1 Mo. 296; Janis v. Gurno, 4 Mo. 458; Lawless v. Newman, 5 Mo. 236; Gurno v. Janis, 6 Mo. 330; Ashby v. Cramer, 7 Mo. 98; Hammond v. Schools, 8 Mo. 65; Dent v. Bingham, 8 Mo. 579; Trotter v. Schools, 9 Mo. 69; Montgomery v. Landusky, 9 Mo. 714; Page v. Scheibel, 11 Mo. 167; Harrison v. Page, 16 Mo. 182; Gamache v. Piquignot, 17 Mo. 310; Soulard v. Clark, 19 Mo. 582; Carondelet v. McPherson, 20 Mo. 201; Milburn v. Hortiz, 23 Mo. 532; Vasquez v. Ewing, 24 Mo. 31; Funkhouser v. Langkoff, 26 Mo. 453; Primm v. Harne, 27 Mo. 205; Milburn v. Hardy, 28 Mo. 514; Dent v. Sigerson, 29 Mo. 489; Carondelet v. St. Louis, 29 Mo. 527; Fine v. Public Schools, 30 Mo. 166; Barry v. Blumenthal, 32 Mo. 29; Langlois v. Crawford, 59 Mo. 456; Glasgow v. Baker, 85 Mo. 559, 128 U. S. 560; St. Louis v. Railroad, 114 Mo. 13; Strother v. Lucas, 12 Peters, 412; LeBois v. Brammell, 4 How. 457; Guitard v. Stoddard, 16 How. 494; Savignac v. Garrison, 59 U. S. 136; Glasgow v. Hortiz, 66 U. S. 595; Carondelet v. St. Louis, 66 U. S. 179; Dent v. Emmeger, 81 U. S. 308; Ryan v. Carter, 93 U. S. 78.   (3) Brown's survey of the commons of Carondelet was authorized and approved.  Dent v. Sigerson, 29 Mo. 489.   (4) The city of St. Louis has succeeded to Carondelet's title. Laws 1870, p. 458; Scheme and Charter of St. Louis. (5)  A lessee cannot dispute his lessor's title.  Walker v. Harper, 33 Mo. 592; Stagg v. Tanning Co., 56 Mo. 317; Bank v. Clavin, 60 Mo. 559; Pierce v. Rollins, 60 Mo. App. 497.

LAMM, J.—Ejectment.  Issue joined on separate general denials.  Judgment for plaintiff.  Both defendants appeal.

Many years before Carondelet was merged in St. Louis by the Scheme and Charter, its "commons" were surveyed and platted by authority, there appearing therein two city lots or blocks, to-wit, 77 and 66— the latter lying north of and being coterminus with the former. Subsequently subdivided and replatted, they in part are now known as blocks 3244, 3243 and 3191. These several numeral designations are referred to in the evidence; but for convenience we will use the ancient numbers. Lying east of those blocks, bounded by them on the west and by the Mississippi river on the east, is a strip 923 feet more or less from north to south, 156 feet more less in width at its north end, and 351 feet more or less in width at its south end, described by metes and bounds in the petition, including therein parts of certain streets known as Marceau and Hurck, which lies on the river bank and is the land in dispute.

St. Louis claims possession on the theory it is the successor of Carondelet in title, and that the part of the river bank in dispute is part of the old *commons* of Carondelet belonging to that town by a direct grant from the United States. Defendant Railway Company claims title as riparian owner and by adverse possession.

In determining the controversy we shall start out with certain assumptions, based either on undisputed proof, or on concessions made below at the trial, or on repeated adjudications by the Supreme Court of the United States (and by this court) establishing the significance, scope, and validity of certain ancient surveys relied on, and interpreting certain early legislative grants made by the United States Government and enabling acts passed by the General Assembly of this State—all pertinent to the issues. The dates, history, scope and effect of those early acts have been so often set forth in our decisions, we need not take space to do so again. Those assumptions are:

(a) That by the Scheme and Charter the city of St. Louis succeeded to all rights and title of Carondelet, existing at that time (1876), to her commons.

(b) That originally, for all purposes of this case, blocks 66 and 77 were part and parcel of the commons of Carondelet, to which she had title in fee' from the General Government.

(c) That, nothing to the contrary appearing, those commons would include the strip in dispute, lying east of those two blocks and running to the west bank of the Mississippi river.

(d) That by a chain of title, whereby Carondelet first leased and then sold those blocks, defendant Railway Company by mesne conveyances holds record title to blocks 66 and 77.

(e) That defendant Wiggins Ferry Company is its present tenant.

(f) That at the time of suit defendants were in possession of the tract in dispute, claiming title.

(g) That under legislative grants of power Carondelet could sell or lease her commons, at the several times she leased and afterwards sold blocks 66 and 77.

(h) That since August 1, 1866 (G. S. 1865, p. 746, sec. 7, chap. 191, reading: "Nothing contained in any statute of limitation shall extend to any lands given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to this State"), title could not be acquired, by adverse possession, to lands given or granted for a public use. That wise statute has been brought down as live law to this day (*Vide*, R. S. 1909, sec. 1886), and can nowhere be more beneficially applied than in preserving to cities, where the facts warrant, grounds on the banks of navigable rivers for levees, wharfs and water fronts.

Those assumptions leave open only two questions, to-wit: (1) Was title lost to the city by adverse possession of ten years prior to August 1, 1866? (2)

Is the tract such an accretion to blocks 77 and 66 as inured to the owner of those blocks as a riparian right?

They are so related by overlapping and interdependence that they may be taken together, and, so taken, both we think must be answered in the negative. This, because:

(1). The out boundaries of the commons of Carondelet were determined by the General Government by an official and approved survey made in 1834, known as "Brown's Survey." [Dent v. Sigerson, 29 Mo. 489.] That survey extended to the Mississippi river and took in the strip in dispute, if it then existed.

**Strip Between Survey and River.** There being no countervailing contentions made, one of our assumptions, "b," was to that effect. These commons included several thousand acres and were not all platted at the same time. There was an early plat made by one Eiler of a portion of the commons lying a little north of blocks 66 and 77. Presently one Mackay in 1847 officially platted the territory lying south of that covered by the Eiler plat and extending on south to the River Des Peres, covering many blocks of irregular areas, among them 66 and 77. Both those plats or maps may be found in St. Louis v. Railroad, 114 Mo. 13 (*q. v.*), and neither will be reproduced here. Mackay's, as did Eiler's, showed a strip or ribbon of shore land between the east boundary line of the blocks in the plat and the river. In Eiler's it is called "a tow or Water St." In Mackay's it is not named at all but seems to be a continuation of the designated strip in Eiler's. [St Louis v. Railroad, supra, 114 Mo. 1. c. 22.] In early instruments in this record this strip is spoken of as "the levee, bank, street or tow path."

Some significance is attached by appellants' counsel to the fact that on the Mackay plat there is a small break in the strip's east boundary line where

that boundary, the water line, reaches a point about opposite the southwest corner of block 66 in the line of its direction, south. As we grasp their **Break in Line of Survey.** suggestion it is that, whatever be the fact as to block 66, there is nothing on Mackay's map to indicate that east of block 77 there was any land in existence at the time his survey and plat were made and recorded. But we cannot follow the lead of that suggestion; since a little further down on the plat we find the marked channel of the River Des Peres (which river is the southern boundary of the Mackay plat) projecting its channel on the map eastwardly beyond the east line of the east tier of blocks, and evidently through a strip of ground lying east of the eastern outboundary of the platted territory until it stops, presumably at the Mississippi's water edge. Moreover, the abrupt termination of the Mississippi's water-line on the plat before reaching the River Des Peres, without any curve or continuation, is made in such way as lends no color to the insistence that the water-line and block-line unite as one in front of block 77. So, too, in 1854 there was a partition in kind of block 77 among its owners and the commissioners filed a plat of the land partitioned, as part of their report, showing a street east of the block and between it and the Mississippi river.

We lay little or no stress on the mere designations of this strip in these ancient instruments, as "a tow" or a "street" or a "levee;" for there is no evidence they were opened and used as a street or a wharf. Neither is there evidence that within the memory of any living man there was a tow path there used by the public; but we do give stubborn importance to the fact that at the time (1847) that portion of the Carondelet commons, shown by the Mackay plat (as well as in 1854, at the time of the commissioners' plat aforesaid), was platted, there was in existence on the

248 Mo—2

earth's surface a strip of ground belonging to the public, a part of the Carondelet commons, lying east of the east tier of blocks, fronting towards the river; for weighty matter hinges on that fact in dealing with the question whether the owners of blocks 66 and 77 were riparian owners, as we shall presently see.

There are cases holding that a tow path, kept up at the charge of the proprietor of the lots and following the changes of the river, does not stand in the way of lot owners being at the same time riparian proprietors. So, too, if the tow or passageway is a mere shifting easement. [St. Louis Public Schools v. Risley, 77 U. S. 91; St. Louis v. Blast Furnace Company, 235 Mo. 1. c. 26-7.] But self-evidently those cases do not reach the facts we are dealing with here.

**Tow Path.**

Carondelet, having theretofore leased block 66, parted with its fee title thereto in July, 1856— the conveyance describing block 66 as "lot 66 in Carondelet commons north of the River Des Peres, containing 14.97 arpents according to the recorded plat of subdivision made by Mackay to which for a full description reference is made." That conveyance did not undertake to convey any then existing strip lying between block 66 and the river. In June, 1853, Carondelet parted with its fee title to block 77 (said block having theretofore been leased and containing 17 arpents and a fraction) under a similar description, omitting all reference to any land lying between the block and the river. We will not follow the mesne conveyances by which, finally in 1903, defendant Railway Company got its title; for they are not essential to the point in mind.

**Deeds.**

On such record, we rule as follows:

Absent all evidence indicating that the strip not conveyed sprang from accretions subsequent in time to those conveyances (as here), and present in the

**Salient Facts.** record persuasive evidence that the strip was in existence before the plat was made, limiting, bounding and numbering those blocks, and the further fact that Carondelet conveyed by reference to that plat, we cannot hold that defendant Railway Company has riparian rights as a shore owner. *Contra,* we must hold that Carondelet did not, by those conveyances, part with its title to that part of its commons included in the strip along its river bank. Nor did it part with its fee title at any time.

**Accretions.** The foregoing ruling is grounded on the familiar doctrine that it is the *shore owner* who is entitled to accretions forming to the shore.

There is a late and well considered case, cited and relied on by appellants, St. Louis v. Blast Furnace Co., 235 Mo. 1, which we may as well speak of at this point. The facts held in judgment there **Another Carondelet Case.** differ essentially from those in judgment here. There defendant held title under a Spanish grant in 1799, running to the river and confirmed by commissioners under early Federal enabling acts. It was an inhabited village lot, not "commons," and Carondelet never had title. Under such circumstances it was held that the accretions inured to the lot owner. It would serve no useful end to consider anew the distinctions between, and devolution of the titles of, "out lots," "com- **Commons Cases.** mon field lots," "village lots" and "commons," as known to early French villages and dealt with in Federal laws having for their purpose to carry out the Louisiana Purchase treaty of 1803. The books are full of exposition in that behalf. Take as samples, the Blast Furnace case, supra; State ex inf. v. Woods, 233 Mo. l. c. 373 et seq., and cases cited; Carondelet v. St. Louis, 25 Mo. 448; Vasquez v. Ewing, 24 Mo. 31, and many cases collated by counsel in briefs.

(2). With the question of riparian rights held adversely to appellants, we confront that of adverse possession. To maintain this contention of an open, adverse and continuous possession under a claim of right for ten years prior to August 1, 1866, they undertake, as they must do (except in a particular considered presently), to tack their possession onto that of the Carondelet Marine Railway and Dock Company. The business of that corporation speaks through its title. It was incorporated by an act of the General Assembly, approved February 28, 1855, to build and own docks and marine railways, with a capital stock of $50,000—$20,000 to be paid in after the election of its board of directors. On December 12 of that year there was a supplemental and amendatory act passed and approved whereby $10,000 (instead of $20,000) should be paid in after the election of directors, and the time for opening books for subscription was extended for two years from the passage of the amendatory act. It does not appear when its subscription books were opened or closed, or it became a going concern. In 1862 the Dock Company purchased a part of block 66 from its then owner and in that deed the eastern boundary is given as the Mississippi river.

*Corporation's Charter as Evidence of Adverse Possession.*

(*Nota bene*: The abstract of title is very long and is copied into the record in full. Some of the conveyances do not relate to the strip in question and it is difficult to ascertain how title to the north half of block 66 is dereigned, nor is it essential we should do so.)

Turning to block 77 the Dock Company got title in November, 1856. The deeds referred specifically to the commissioners' plat in partition, heretofore mentioned, but they also assumed to convey all the "interest" of the several grantors to the land lying east of the east line of the block between that and the river.

**License to Use.** Before that, in May, 1856, Carondelet agreed to convey certain real estate to one Ivory, to-wit, blocks 72, 29 and 17 of its commons, none of them on the Mississippi river. In consideration thereof Ivory agreed to establish and put in operation on the latter river a dock for the repair of steam boats of a given capacity within twelve months and a marine railroad to be begun within six months. Among other provisions is the following:

"And it is further agreed, that the said Ivory, or his assigns, owners of said docks or railway, shall have the privilege of using for the purposes of said dock or railway the levee, bank, street or towpath, lying opposite the said dock, or on which said railway may be constructed, to his or their own exclusive advantage and enjoyment for the term of forty years from and after this agreement, subject to the conditions hereinafter mentioned, the said city for the time being abandoning all right of way or other use or uses thereof."

There are other provisions not essential to any question up for determination. That agreement was duly acknowledged and recorded. In April, 1859, for a consideration of one dollar (and other unexpressed considerations) there was executed and duly placed of record an assignment by Ivory of all his right, title and interest acquired through the foregoing instrument with all its privileges and immunities to the Carondelet Marine and Dock Company. In 1870 the following ordinance was passed by Carondelet:

"*An Ordinance extending to the Marine Railway and Dock Company certain exemptions and privileges heretofore granted.*

"Whereas, The Carondelet and Marine Dock Company have strictly and faithfully complied with all and singular the conditions, terms and stip-
**Ordinance Indicating License.** ulations contained in a certain contract entered into between said city and John

C. Ivory, in behalf of said company, dated the 16th day of June, 1856, in pursuance of a resolution of the city council passed on the 31st day of May, 1856; and

"Whereas, said Marine Railway was the first public improvement in this city, has proved to be of incalculable benefit to the community, attracting a large population of mechanics and laborers, and distributing many thousands of dollars yearly among the working classes of this city—all of which deserves at our hands a fitting acknowledgment and a proportionate encouragement.

"*Therefore, Be it ordained by the city council of the city of Carondelet, as follows*:

"Section 1. The said Marine Railway and Dock Company are hereby exempt from all city taxation, general as well as special, on all improvements, buildings and machinery now used and hereafter to be erected and established by them on the real estate now owned and occupied by them, lying south of Marceau street, extending southwardly and parallel with the Iron Mountain Railroad tract to the intersection of the northwest corner of the property now owned and used and belonging to the Kingsland Iron Company, thence westwardly to the Mississippi river.

"Section 2. Said exemptions shall commence from and after the passage of this ordinance, and continue for and during the period of twenty-five years thereafter.

"Section 3. Said company shall further continue to have the exclusive use for said term of twenty-five years of that part of Marceau street which lies east of the Iron Mountain Railroad tract, and extends eastwardly to the Mississippi river at low-water mark.

"Section 4. The mayor is authorized and directed to enter into a written agreement with said company, setting forth in substance the provisions of this ordinance, and containing a condition that the privileges

and exemptions herein granted shall end and determine whenever, in the opinion of the city council of said city or of its municipal successor, said Marine Railway and Dock Company ceases to be in successful and continued operation, and shall contain such further conditions and terms as he may deem proper and necessary to carry out the intent and object of this ordinance.

"Section 5. This ordinance shall take effect and be in force from and after the filing with the City Register of a duplicate of said contract.

"Approved, April 4, 1870."

The ordinance was not objected to below, but the admission of the agreement between Carondelet and Ivory was objected to by appellants, in these words: "I object to that for the reason that it is not binding on us."

That possession was taken of the strip in dispute for Dock and Marine Railway purposes at about the time of the Ivory agreement is abundantly shown. That such possession at least in the very early sixties and late fifties and thence on was exclusive, also appears. That it was continuous must be admitted. But we look in vain for satisfactory evidence that it was adverse for ten years prior to August 1, 1866. The burden, on that score, was on appellants. Let it be conceded there is evidence of an intent or preparation to claim an adverse holding later on, but that does not help appellants. The ordinance of 1870, introduced in evidence without objections, lends countenance to the theory that the strip was occupied and held under the Ivory concession and not adversely to Carondelet. There is no claim, pretense or showing that any plant or system of dockage or marine ways was built in Carondelet except one. The nominal consideration in the Ivory assignment lends color to the idea that he probably took and held for the benefit of the Dock Company.

*Possession Not Adverse.*

That is not an infrequent expedient in the preliminary stages of the development of a corporation. So, the fact that the Dock Company had a leeway of two years under its amendatory incorporating act, after December 12, 1855, to open its subscription books indicates that there was an expectation of a considerable time to elapse before it would be ready and fully equipped to build its plant and go into active operation.

We now recur to a phase, heretofore alluded to on the question of when adverse possession began, viz.: It is argued for appellants that in 1856 a predecessor of the St. Louis, Iron Mountain and *Southern Railway* Company, to-wit, the St. Louis and Iron Mountain *Railroad* Company, was in possession under claim of title both of block 66 and of the intervening space between that and the river; and that such possession is a controlling factor. We ought not to take judicial notice that the named company was the predecessor of defendant company, the record being dark one way or the other on the fact; but if the fact were admitted there is no evidence of adverse possession of the very strip in dispute in the *"Railroad* Company." In July, 1856, that company was grantee in a deed to part of block 66, described as running to the river. The conveyance was made in consideration of certain benefits, to-wit, the location of freight and passenger depots and a machine and repair shops—the depot building to be erected in one year. On March 11, 1859, in consideration of one dollar that "railroad company" redeeded the property to the persons from whom it got title, reserving only to itself a right of way through the premises. Presumably the consideration of the grant had failed, as the record is silent on the location of machine shops, depot buildings, etc. On such record, we will not assume possession adverse to the city of the strip in dispute, since plats in evidence show the railroad tracts are in fact located west of the strip and in blocks 66 and 77 proper.

Finally, it must be kept steadily in mind that the suit is at law, not in equity. In such case the stiff rule is that where there is evidence to sustain the

**Suit at Law.** verdict of the jury or the finding of a court sitting in that capacity, as here, an appellate court is bound by it. [Donaldson Bond & Stock Company v. Houck, 213 Mo. 1. c. 426-7.]

On the whole record (reserving for the present the objection to the introduction of the Ivory agreement) we hold appellants did not successfully carry the burden of showing an open, unbroken, adverse possession of the strip in litigation for ten year prior to August 1, 1866, and the point is ruled against them.

(3). Adverse possession being disposed of in paragraph two on the assumed theory there was no reversible error in admitting evidence, we come, in conclusion, to that pretermitted factor. When the

**Competency of Evidence.** Ivory concession agreement was offered by respondent, in rebuttal to the showing made by appellants on their defense of adverse possession, it was challenged thus: "By Mr. Herbel (interrupting): I object to that for the reason that it is not binding on us." The objection was overruled and counsel marked the ruling with an exception and now assign error thereon.

The point is without substance, because:

(a) The point made below is not made above. Below, the objection was: "It is not binding on *us.*" Above, the objection assumes a new countenance, viz., that the agreement was *ultra vires,* hence bad from

**Shifting Objection.** lack of power to execute it—essentially another matter. The first objection impliedly assumes it was binding on the parties to it, but not on "us." The last logically faces the other way and is an assault on the instrument itself because *ultra vires.* The first would be sustained by showing that appellants were not parties to it, or in privity with those that are; the last lays an ax at the

root of the instrument. The first objection is no longer tenable, because it was subsequently shown that appellants held under the Dock Company and that the Dock Company took an assignment of the Ivory concession and stood in Ivory's shoes. It is old and good doctrine that on appeal a cause must be heard on the trial theory. So it has been ruled that an objection below must not be altered to another above, thereby shifting positions. [Bragg v. Railroad, 192 Mo. 1. c. 342, and cases cited.] Any other course would open wide the door to reverse judgments on exceptions not ruled below at all.

(b) But waiving that view for the nonce and attending to the merits, the point is still without substance. We are referred by learned counsel for appellants to an aggregation of cases holding that a city has no power to vacate or surrender possession of its *de facto* streets and wharfs to private persons for private uses. That such contracts are *ultra* **Surrender by** *vires.* That they cannot be enforced if **City of Streets.** unexecuted. That such city may repudiate them, or be compelled at the suit of private persons having a justiciable interest to resume its duties as trustee for the public, etc. We have considered those cases one by one, and find the facts are dissimilar in kind from the facts of this record. We are not satisfied in the first place that the strip in dispute was a public street. Counsel we think proceed on a wrong premise in that regard. Some paper streets are named in the concession, but they were short cross streets never opened or improved and at most cover little of the land. Now, Carondelet had legislative power granted to it to lease its commons as contradistinguished from its streets.

Moreover, having got possession under the Ivory concession, as we have been constrained to hold, and having enjoyed the fruits of that concession, would it not be bad morals and bad law to hold that parties

holding under that concession could acquire title from the true owner by claiming to hold adversely during the life of the concession? If we were able to say that the possession taken was not under the concession, but the assertion of an independent right (as appears in some cases cited, for instance: Atlantic & Pacific Railroad Co. v. St. Louis, 66 Mo. 228), a different case would be here for disposition. In that event, if the concession were held to be *ultra vires*, it would cut no figure one way or the other.

To illustrate further with an a-b-c case: Suppose A let to B for a term of twelve years a tenement, expressed on the face of the lease to be *contra bonas mores*, to-wit, for bawdry. Given that B took possession under the lease and held for twelve years, then, because the lease was void as *malum in se* could B retain the tenement as his own under the Statute of Limitations? How much less would that proposition be sound where the lease was merely bad for want of authority to execute it?

The doctrine that a party under a mere *ultra vires* contract may not get and retain benefits thereunder and turn about and repudiate the contract is well grounded in principle. [St Louis v. Davidson, 102 Mo. 149; Mayor v. Sonneborn, 113 N. Y. 423; Bank v. Trust Co., 187 Mo. 494.]

The proposition advanced is akin to that repudiated by the courts, viz., that a party may take the benefits of an unconstitutional law and afterwards plead its unconstitutionality. [State ex rel. Kinsey v. Messerly, 198 Mo. 351; Daniels v. Tearney, 102 U. S. l. c. 421, and cases cited.]

The damages below and monthly rents were nominal. The action was brought to assert a right in the city to a part of its water front. The instructions given showed the trial court rightly conceived the law. The judgment was right. Let it be affirmed. It is so ordered. All concur.