THOMAS J. ADAMS v. CATHERINE WRIGHT, Appellant.—No. 39262.— 187 S. W. (2d) 216.

Division One, May 1, 1945.

*Lawson & Hale* for appellant.

1228

*Alan F. Wherritt* for respondent.

BRADLEY, C.—Action, in separate counts, to determine title and in ejectment. Cause was tried to a jury; verdict for defendant on both counts. Plaintiff's motion for a new trial was sustained and defendant appealed.

The land involved lies in Clay County, and is described in the petition as the east 2 acres and the west 3.08 acres of tract 12, Urban Heights addition, etc. It is conceded that the record title is in plaintiff. Defendant claims title by adverse possession under the 10 years statute of limitations, and she also pleaded that she purchased the land in 1927 from the owners and was by them put in possession; that she has remained in possession, and has fully paid the purchase price.

It was agreed that in the 1920s the title was in E. H. Norton, as trustee for the Urban Heights Land Company composed of E. H. Norton, E. E. Kirkland, John R. Smiley, and Spurgeon Campbell. And it was agreed that the Urban Heights Land Company was the common source of title.

In the 1920s the Urban Heights Land Company subdivided a 70 or 80 acre tract of land, of which the land here involved is a part, and sold a part of the subdivision. E. E. Kirkland was salesman for the company. Among the purchasers was defendant who purchased the land here involved. She did not receive a deed. Kirkland testified there was a written contract, but the contract was not in evidence and the purchase price was not shown.

In 1932, or prior, effort to sell the unsold portion of the subdivision, it seems, was abandoned, and trustee Norton, on January 18, 1932, conveyed a portion of the unsold subdivision to Nellie C. Campbell, wife of Spurgeon Campbell, and included in the deed the east 2 acres claimed by defendant. On January 20, 1932, Norton conveyed to Kirkland the remaining portion of the unsold subdivision and included in the deed the west 3.08 acres claimed by defendant.

December 13, 1932, Kirkland gave a deed of trust, on the land conveyed to him, to C. H. Coppinger, trustee for the Citizens Bank of Liberty, Missouri, to secure an indebtedness of $3213.71. June 13, 1933, Mrs. Campbell gave a deed of trust, on the land conveyed to her, to A. C. Wherritt, trustee for the Citizens Bank of Liberty, to secure an indebtedness of $3610. These deeds of trust were foreclosed October 24, 1939, and both of the trustee's deeds were to George R. Scovern, who held for the bank, we infer. The Kirkland land sold for $750, and the Mrs. Campbell land sold for $750. November 4, 1939, Scovern, as we infer, conveyed all the land acquired by him at the foreclosure sale to Leo H. Adams for an expressed consideration of $1.00. This cause was commenced May 10, 1941, and was first tried in 1942, resulting in a verdict for defendant. A new trial was granted and the cause retried.

The second new trial was granted on the ground that the court erred in refusing to direct a verdict for plaintiff, and in giving defendant's instructions.

Plaintiff introduced the deeds mentioned, supra, showing the devolution of title, and testified (all narration ours):

"I bought from the bank around 13 acres; paid some over $400 per acre. I went out and looked at the property before I got the deed. I checked it over to see the different building places. I saw Mrs. Wright's place. I was aware of everything that was on there when I purchased it. There were 5 or 6 different tracts in these 12 acres I bought. Mrs. Wright's house is on the east side of the 3.08 acres. The 2 acres claimed by her lies east of her house. The 2 acre

piece is very good ground, but west of that is a gulley. I talked to this gentleman living in this other house a half block from Mrs. Wright and he got off, but Mrs. Wright said she was going to stay; said that she had bought the property and it was hers and she was going to stay there. Mrs. Wright has kept me from taking possession of the whole 5 acres (the 2 acres and the 3.08 acres) since 1940. She told me that she owned it and wouldn't get off. I knew she had a building on it and some chicken houses and outbuildings and that a part of it was fenced.''

E. E. Kirkland, a witness for plaintiff, testified: ''In the 1920s I was in the real estate business; I was the sales agent for the Urban Heights Land Company. Mrs. Wright had a written contract. My recollection is she first contracted for the 3.08 acres and then a short time later the 2 acres. Q. The time (January 20, 1932) you acquired title to the 3.08 acres Mrs. Wright hadn't been paying on that 3.08 acres, had she? A. Well, I don't know and I don't know what the purchase price was. I would have a guess on about what she paid me. Whether she paid anybody else, I don't know. I kept no record of my part of what she paid except get (gave) a receipt for what she paid me. . . .

''I haven't talked to Mrs. Wright for 10 years, according to my best recollection. Even before the land was deeded to me, it got to the point where we couldn't sell it. I wasn't interested in it; that's the truth. From 1932 to 1939, while I owned the 3.08 acres, I don't think Mrs. Wright ever claimed it adversely to me. I don't remember if she did. I never bothered her about it. After 1930, I never claimed that any more money was coming on the purchase price from Mrs. Wright, and I never heard of any of the other men claiming it.''

Kirkland identified 20 receipts signed by him for money paid to him by Mrs. Wright on the purchase price of the land. These receipts ranged in date from March 24, 1927, when $50 was paid, to December 6, 1930, and eliminating a duplicate or two and assuming one for which no amount is given is $25, like most of the others, these receipts amount to about $400.

Kirkland further testified: ''I don't know whether Mrs. Wright paid Norton at the bank or any of the others. I think she paid me, because she got in after the bank closed. I don't know of any claim made on Mrs. Wright after her last payment in 1930. Q. Did Mrs. Wright ever come in and tell you that she claimed adversely to you? A. I don't remember her saying it. She just told me she was there and was aiming to pay it out, was all she ever told me.''

Defendant used 7 of her neighbors as witnesses. These were Robert S. Withers, Mrs. E. D. Cavender, Mrs. J. B. Bingamen, Mrs. D. H. Cantrell, Mrs. Clay Schoolfield, Mrs. Rose Reynolds, and Mrs. J. C. Swain. These testified as follows:

Withers: "I have known Mrs. Wright's place for 25 years. Her house has been there for 12 or 14 years; she built it and she has lived there 12 or 14 years (trial was March 20, 1944). The tract is enclosed by a fence; some of the fence has been there, I expect, since the house was built. There are some outbuildings and a little vegetable garden east of the house and some fruit trees. Mrs. Wright told me she owned the place. She worked at the Odd Fellows Home for a long time. After leaving the Odd Fellows Home she was employed at various places. She helped the neighbors, and I think she was janitor at the school house, and she worked at the club house and cleaned it up."

Mrs. Bingamen: "I live about one-half mile from Mrs. Wright; have lived there, I think, 16 years, and have known Mrs. Wright about 14 years. She lived where she now lives (on the land involved) when I first met her. The land is enclosed and has been quite awhile, 10 or 12 years. She has claimed to own the land ever since I have known her. She peddled vegetables, chickens, eggs, etc. She told me she had a pretty hard time trying to peddle the stuff around to make money to pay on her place. She told me she owned it and how many acres she had. She said that was the only home she ever had. We gave her, 10 or 11 years ago, some doors and windows when she was trying to get some lumber to add on the second floor to her little basement that she lives in."

Mrs. Cantrell: "I have known Mrs. Wright about 14 years. She has lived where she now lives at least 12 years, and she has had the house fenced all that time. She has a chicken house and there is another outbuilding, and a garden. There is a driveway and a north and south fence east of the driveway. The fence has been there since I can remember. I never heard her title questioned before Tom Adams filed this suit. I heard Mrs. Wright say she owned the property; that was when I was teaching there at the Withers school in 1930; she was my janitor for 5 years at the Withers school. Her garden lies southeast of her house (on the 2 acre tract). Q. But she hasn't, in your experience out there, she hasn't ever exercised any control over this two acres, has she? A. Yes. I have seen her working out there cutting sprouts and digging them out. Q. How long ago? A. Well, that was when I was teaching there, which was from 1930 to 1935."

It will not be necessary to set out the evidence of the other witnesses. They testified to the same general effect as those whose evidence is set out, except Mrs. Schoolfield and Mrs. Swain said that Mrs. Wright had been on the place for 14 or 15 years.

Plaintiff (respondent) contends that defendant's evidence did not contain all the elements of adverse possession and that defendant did not make a submissible issue on the question of payment. As we see it, the sole question is payment. Under the facts, if defendant

did not pay for the land, there would be no question on adverse possession. While there was no contract introduced in evidence, it is not contended by defendant that there was not a written contract of purchase and that she went into possession under this contract, perhaps two written contracts, one for the 3.08 acres and one for the 2 acres.

One rule of real property law is that where the vendor has delivered possession to the vendee, but retains the legal title under a contract to deliver a deed when the purchase money is fully paid (likely the case here), the holding of the vendee will not be deemed adverse and the statute of limitation will not begin to run until the purchase price is paid. Adair v. Adair, 78 Mo. 630; Long v. The Kansas City Stock Yards Company, 107 Mo. 298, 17 S. W. 656; City of St. Louis v. St. Louis I. M. & S. Ry. Co., 248 Mo. 10, 154 S. W. 55.

The exact date of the contract of purchase was not shown, but defendant alleged that she purchased in 1927, and so far as shown, the first payment was on March 24, 1927, and the last one on December 6, 1930. As stated, the suit was filed May 10, 1941, so if there was substantial evidence that defendant paid in full the purchase price by the payment of December 6, 1930, then, it will be conceded, we think, that plaintiff's request for a directed verdict was properly refused.

Kirkland, who sold the land to plaintiff, testified, as appears, supra: (1) That he did not know what the purchase price was; (2) that receipts in evidence and totaling about $400 were for payments made to him by defendant on the land; (3) that he did not know whether she made payments to any other member of the Urban Heights Land Company; (4) that he made no record of the payments except that he gave receipts; (5) that after 1930 he never claimed that any more money was coming on the purchase price and never heard any of his associates make such a claim; (6) that he had not talked to defendant for 10 years.

State ex rel. Robinson v. Trimble et al., 329 Mo. 77, 43 S. W. (2d) 1044, was in certiorari to quash the ruling of the Kansas City Court of Appeals in Rhoades v. Robinson's Estate et al., not published, it seems. The same case was once before in the court of appeals [222 Mo. App. 912, 6 S. W. (2d) 1007]. In the second opinion (not published) the court of appeals held that the evidence was not sufficient to make a submissible issue on the question of payment involved. The facts were these:

Claude M. Kackley, an attorney, had office privileges in the law offices of Judge Elijah Robinson, Kansas City. Judge Robinson tried many cases brought to him by Kackley. One Rhoades had a damage suit for malicious prosecution against the Chicago Great Western Railroad Company, and employed Kackley on a 50% contingent contract, and Kackley associated Robinson and John J. Hess, an attorney of Council Bluffs, Iowa. The three were to share the fee equally. The

case was tried in 1916, and Rhoades got a judgment for $7,000, and thereafter went to France as a soldier. The judgment was affirmed for $4,000. See 204 S. W. 584.

Rhoades returned from France in 1919, and June 25, 1919, Robinson lent Rhoades $700, secured by assignment of Rhoades' interest in the judgment. July 31, 1920, the judgment with interest ($4,983.35) was paid to Robinson. Thereupon he notified Hess and requested him to come to Kansas City. Hess came and on August 13, 1920, Robinson paid Hess and Kackley their fees. Robinson died in September, 1922. It had been his practice.to place in the file of a case the receipts and cancelled checks pertinent to the case. In two weeks after Robinson's death Kackley took from Robinson's office all the files and papers in the Rhoades case. Although he had associated Robinson in many cases, the Rhoades file was the only file removed. About a year after removing this file Kackley referred Rhoades to an attorney who filed a claim for Rhoades against Robinson's estate.

The facts are summarized in the certiorari opinion as follows [43 S. W. (2d) l. c. 1045]: "Now the facts as found in the opinion disclose that the costs and expenses of the litigation and the attorneys' fees were promptly paid by Robinson; that it was his practice to place canceled checks and receipts in cases in the file of the case; that plaintiff, after returning from France, notified Kackley of his return and where he was located; that he was afterwards in communication with Kackley about the judgment; that plaintiff was in need of money; that he remained silent for three years after Robinson had paid said costs, expenses, and attorneys' fees; that he remained silent for one year after the death of Robinson; that Kackley, within two weeks after the death of Robinson removed the file in the case from the office of Robinson; that, when the file was produced in the probate court, it contained no evidence of payment to Kackley or plaintiff; that the administrator did not know the file had been removed from the office until after this claim was filed in the probate court; and that Kackley assisted the plaintiff in procuring the services of an attorney to file the claim."

The ruling of the court of appeals that the facts in the Rhoades case were not sufficient to make a submissible issue on the question of payment was quashed, and we think the ruling is in point on the question of payment in the present case, and supports defendant's contention that the evidence was sufficient to make a submissible issue on the question of payment, and we so rule. See also McFaul v. Haley, 166 Mo. 56, 65 S. W. 995; Linderman et al. v. Carmin, 255 Mo. 62, 164 S. W. 614.

■ As appears, supra, one of the grounds upon which the trial court granted the new trial was that the court erred in giving defendant's instructions. Defendant's instructions were principally on the subject of adverse possession, as were plaintiffs, but plaintiff,

in his instructions, specifically submitted the question of payment. The real question, as we have ruled, was payment. There was no issue and there could have been no issue on title by adverse possession prior to payment, therefore, defendant's instructions could not have misled the jury. The verdict on each count was general, and if there was substantial evidence of payment, and we have so held, then the new trial should not have been granted.

The order or judgment granting the new trial should be reversed and the cause remanded with direction to set aside said order, reinstate the verdicts for defendant and enter judgment thereon. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by *Bradley, C.,* is adopted as the opinion of the court. All the judges concur.