[Cite as *Hampton v. Lively*, 2020-Ohio-4713.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| CAROL JEAN HAMPTON, | : | Case No. 19CA9 |
| Plaintiff-Appellant, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| CHAD LIVELY, | : | |
| Defendant-Appellee. | : | **RELEASED 9/28/2020** |

_____
<u>APPEARANCES</u>:

Brigham M. Anderson, Ironton, Ohio, for appellant.

Randall L. Lambert, Ironton, Ohio, for appellee.
_____
Hess, J.

{¶1}   The Estate of Carol Jean Hampton (the "Estate") appeals from a judgment of the Lawrence County Common Pleas Court denying its adverse possession claim regarding certain real property in Lawrence County.  The Estate contends that the court misapplied the law and erred when it found that the Estate failed to prove adverse use of the property for the requisite 21-year period.  The evidence shows that in 1980, Carol Jean Hampton and her family took possession of the property pursuant to a sales contract after payment of the purchase price, and for over 21 years, they possessed the property and treated it as their own even though no change in record ownership occurred.  This use was adverse, not permissive, because it was not accompanied by an express or implied recognition of a right of the sellers to terminate it.  The trial court misapplied the law to the extent it suggested otherwise, and its related conclusion that the Estate failed in its burden to show adverse use for 21 years is against the manifest

weight of the evidence. Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} In October 2016, Carol Jean Hampton filed a complaint against Chad Lively, the record owner of 1606 Charlotte Street, Ironton, Ohio, located in the Green Valley Estates subdivision, alleging she had obtained legal ownership of the property by adverse possession and asking the court to, among other things, quiet title. Subsequently, she died, and the trial court substituted her estate as plaintiff.

{¶3} A magistrate conducted a bench trial and heard evidence that Chad Lively's grandparents, Thomas and Louise Lively, acquired the property in 1960 and remained the record owners until 2016, when Chad Lively probated the estates of his grandparents and his father, James Lively, and became the record owner. However, from 1980 to 2012, Carol Jean Hampton lived on the property, which she shared for many years with her husband, Paul Destocki, and their sons, Paul Eddie and Chris (the "Hampton/Destocki family").

{¶4} Beverly Nance ("Nance"), Carol Jean Hampton's sister, testified that one day in 1980, Nance and her mother, Leona Hampton, went to Green Valley Estates to look for a house for the Hampton/Destocki family. They toured two homes on Charlotte Street with "for sale" signs outside. They liked the property at issue, and her mother decided to buy it. The next day, Nance saw her mother write a check but did not see the face of it. They drove to the property, where her mother talked to Louise Lively and gave her the check. Nance did not see or converse with the Lively family after that day. She testified that the Hampton/Destocki family moved to the property about 30 to 45 days

later and lived there for at least 30 years.  Nance testified that from 1980 until 2016, tax bills for the property, which had the names of Thomas and Louise Lively on them, came to her home.  Her family paid the property taxes from 1980 through 2015.

{¶5}   Chris Hampton Destocki ("Destocki") testified that shortly after his birth in 1980, his family moved onto the property.  His brother moved out around 1992 or 1993, and Destocki moved out in 1998.  His parents remained on the property until 2012.  His father had a stroke and spent four months at a physical therapy facility.  After his father was discharged in May 2012, his parents moved in with him.  Destocki testified that after his father died in December 2013, his mother wanted to move back to the house, so they began to remodel it.  However, the last time Destocki was in the house was in 2015, and his mother never moved back before her death.  Destocki admitted that he could not locate any documentation regarding the check his grandmother gave Louise Lively in 1980 and that he had never seen a deed to the property.  However, he testified that everything his grandmother bought was "always bought and paid for right there" with cash or check.  He was unaware of any other payments on the property, never witnessed any interaction between his mother and the Lively family, and was unaware of any agreement between them.  He explained that it was not unusual for his family to not record a deed because "they were afraid of law suits [sic]" and that his mother was a hoarder who "put everything off" and "always thought she had tomorrow."  He testified that a deed could have been in the house with other important documents, but he had no reason to look for one prior to 2016 and did not have access to the house after 2016, so "that stuff is gone forever."  Destocki testified that his grandmother added a garage to the

house in 1992 or 1993, that his father had maintained homeowners' insurance on the property, and that his family had paid property taxes on it.

{¶6}   Sara Francis Salisbury testified that she has lived next door to the property for 61 years.  She believed Carol Jean Hampton and her husband owned the property because "[a]ccording to * * * Louise Lively they sold the house to them."

{¶7}   Chad Lively ("Lively") testified that he was born in 1973 and lived on the property with his grandparents and father from 1973 until 1980.  Lively testified that in late 1979 or early 1980, he witnessed a conversation between his grandmother, Carol Jean Hampton, and Paul Destocki but did know the subject of it. In 1980, his grandparents purchased a house in Florida because his grandfather had health issues and needed to live in a warmer climate, and the family moved there. Lively acknowledged the Hampton/Destocki family possessed the property between 1980 and 2012 and testified that "[t]here must have been some kind of an arrangement" between them and his grandparents even though he did not know the details of it.  Lively testified that after moving to Florida, he observed his grandparents continue to hold themselves out as the owners of the property, and he thought they owned it based on conversations with them and his father.  However, he had no knowledge of his grandparents or father going back to the property, conversing with the Hampton/Destocki family, receiving rent payments, maintaining the property, or expending money on it between 1980 and their deaths.  His grandfather died in 1989, and his grandmother sold the Florida house in 1992, moved to an apartment, and died in 1997.  Lively's father moved back to Ohio in 2004 and lived in Ironton for a year before his death in 2007.  From 1980 until 2016, Lively went to Lawrence County four or five times but went to the property only once

around 2003 or 2004 and knocked on the door. Lively admitted that he never received rent for the property, and prior to 2016, he did not converse with the Hampton/Destocki family, maintain the property, or expend money on it. Lively lived in Florida until 2016 when he became the record owner of the property and moved onto it. Lively testified that at that time, the house was in poor condition, contained a lot of garbage, and showed no signs of a recent remodel.

{¶8} Brandy Lively testified that she met Lively around 1999 or 2000 and married him in 2005. She witnessed conversations between Lively and his father about the property in which Lively indicated that "the house was his," that his family had "left the house with people," and that he "intended on one day coming back." In 2007 and 2010, she and Lively came to Lawrence County for the funerals of his father and step-father respectively, but she did not go to the property. Around 2010 or 2011, she unsuccessfully tried to contact Carol Jean Hampton after getting a report that the property "wasn't in good condition." In 2016, she obtained information about the local health department possibly condemning the property. She sent Destocki a message expressing interest in purchasing the property from his family to "bait" him into responding because she wanted to get in touch with his mother to discuss the condition of the property. She "had no intention of purchasing a house that we already owned."

{¶9} The magistrate found that from 1980 to 2012, the Hampton/Destocki family continuously, exclusively, openly, and notoriously possessed the property but that the Estate failed to establish adverse use of the property for 21 years. The Estate filed objections to the magistrate's decision, which the trial court overruled. The court agreed with the magistrate that the Estate established the elements of its adverse possession

claim by clear and convincing evidence except adverse use for 21 years. The court found that "[t]he evidence proffered by [the Estate] at trial indicated that some form of financial transaction occurred in or around 1980 between Leona Hampton and Thomas and Louise Lively, after which the Livelys vacated the house and moved to Florida and Carol Jean Hampton and her family took up residency at 1606 Charlotte Street, but no deed or written evidence regarding the transaction was produced at trial." The court stated that "[r]egardless of whether there was an alleged sale, lease or advanced rent paid, the obvious conclusion is that the Hampton/Destocki family initially moved into the property with the permission and consent of the Livelys." The court explained that possession is not adverse if it is with the owner's permission, that the permission did not terminate until Louise Lively died in 1997, and that two events—abandonment of the property in 2012 and Chad Lively obtaining record title in 2016—"terminated the Plaintiff's consecutive years short of the 21-year requirement."

## II. ASSIGNMENT OF ERROR

{¶10} The Estate presents one assignment of error:

The Trial Court erred when it failed to find that the Plaintiff had adversely possessed 1606 Charlotte Street, Ironton, Ohio 45638 and misapplied the law and meaning of "adverse," as it relates to an Adverse Possession Claim.

## III. LAW AND ANALYSIS

{¶11} The Estate maintains that the trial court erred when it held that the Estate failed to prove adverse use of the property for 21 years. The Estate asserts that the court misapplied the law and the meaning of "adverse" when it concluded that Carol Jean Hampton's initial possession of the property was not adverse "due to the fact that

she purchased the property and a deed was never recorded." The Estate contends that "[t]here is no question that the facts at trial in this case established that Carol Jean Hampton occupied what she believed to be her own property" and that the Estate proved adverse use under *Evanich v. Bridge*, 119 Ohio St.3d 260, 2008-Ohio-3820, 893 N.E.2d 481, because Carol Jean Hampton possessed the property and treated it as her own for more than 21 years.

**{¶12}** Lively maintains that without documentary evidence of a sale, "it is impossible to ascertain the arrangement" between his grandparents and the Hampton/Destocki family, and the check Louise Lively accepted could have been a down payment or rent. Lively claims that his grandparents believed they still owned the property and notes that until 2016, they were the record owners, and the property tax bills listed them as such. He also asserts that regardless of what the agreement was, it is "obvious" the Hampton/Destocki family "moved in with permission."

**{¶13}** In *Turner v. Robinson*, 4th Dist. Highland No. 16CA21, 2017-Ohio-7228, ¶ 29, we explained:

> "An appeal of a ruling on an adverse possession claim is usually reviewed under a 'manifest weight of the evidence' standard of review." *Nolen v. Rase*, 4th Dist. Scioto No. 13CA3536, 2013-Ohio-5680, ¶ 9. "In other words, an appellate court will not reverse a trial court's decision on this issue if it is supported by some competent, credible evidence." *Id.* "This standard of review is highly deferential and even the existence of 'some' evidence is sufficient to support a court's judgment and to prevent a reversal." *Id.* However, where the appellant challenges the trial court's choice or application of law, our review is de novo. *Pottmeyer v. Douglas*, 4th Dist. Washington No. 10CA7, 2010-Ohio-5293, ¶ 21.

**{¶14}** "To acquire title by adverse possession, a party must prove, by clear and convincing evidence, exclusive possession and open, notorious, continuous, and adverse use for a period of twenty-one years." *Grace v. Koch*, 81 Ohio St.3d 577, 692

N.E.2d 1009 (1998), syllabus. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶15} The trial court determined that the Estate proved exclusive possession and open, notorious, and continuous use of the property for a 21-year period; the dispute on appeal centers on whether the Estate proved adverse use for the requisite period. "[I]ntent is objective rather than subjective in determining whether the adversity element of adverse possession has been established, and the legal requirement that possession be adverse is satisfied by clear and convincing evidence that for 21 years the claimant possessed property and treated it as the claimant's own." *Evanich*, 119 Ohio St.3d 260, 2008-Ohio-3820, 893 N.E.2d 481, at ¶ 13. Adverse use is "non-permissive use." *Turner* at ¶ 37.

{¶16} The trial court misapplied the law when it suggested that possession pursuant to a sales contract is never adverse use, and its related conclusion that the Estate failed to prove adverse use for 21 years by clear and convincing evidence is against the manifest weight of the evidence. If a buyer takes possession of property after paying the purchase price, the buyer manifests an intent to treat the property as his or her own because the buyer's performance triggers the seller's duty to convey legal title to the buyer. *See generally Coggshal v. Marine Bank Co.*, 63 Ohio St. 88, 57 N.E. 1086 (1900), paragraph one of the syllabus ("The interest of the vendee of land before

conveyance is an equitable estate in the land, equal to the amount of the purchase money paid, and which, upon full payment, may ripen into a complete equity, entitling him to a conveyance of the legal title according to the terms of the contract * * *"); *Adams v. Wright*, 353 Mo. 1226, 1232, 187 S.W.2d 216 (1945) ("One rule of real property law is that where the vendor has delivered possession to the vendee, but retains the legal title under a contract to deliver a deed when the purchase money is fully paid * * *, the holding of the vendee will not be deemed adverse * * * *until the purchase price is paid*" (Emphasis added.)).   The buyer's use is not permissive because it is not accompanied by an express or implied recognition of a right of the seller to terminate the use.   *See Cadwallader v. Scovanner*, 178 Ohio App.3d 26, 2008-Ohio-4166, 896 N.E.2d 748, ¶ 57 (12th Dist.), quoting *Manos v. Day Cleaners & Dyers, Inc.*, 91 Ohio App. 361, 363, 108 N.E.2d 347 (9th Dist.1952) (a use is not adverse if it is accompanied by " 'an express or implied recognition of the landowner's right to put an end to the use' "); *Tenney v. Luplow*, 103 Ariz. 363, 369, 442 P.2d 107 (1968), quoting *Miller v. Conley*, 96 Or. 413, 419, 190 P. 301 (1920) (permissive use exists when there is " 'permission merely to occupy land in subordination to the legal title of the one granting the permission' " and " 'does not include possession given with design to confer the legal title upon the one who assumes the occupancy' "); *see generally Fountain v. Lewiston Natl. Bank*, 11 Idaho 451, 509-510, 83 P. 505 (1905) ("It is clear, * * * upon principle, that one who purchases a tract of land and pays the purchase price and enters into the possession thereof, believing he has title whether he receives a good deed of conveyance, an imperfect one, or no deed at all, nevertheless enters into a possession adversely to the vendor and all the rest of the world; and, while the entry is made with the permission of the owner, it is

from that moment adverse to him, and an adverse and hostile possession is the real intent of the party to such a contract").

{¶17} Although the trial court did not specifically resolve whether the 1980 transaction was a sale or lease, there is no competent, credible evidence that would support the conclusion that the Hampton/Destocki family took possession pursuant to a lease agreement.  Rather, the evidence shows that the family took possession pursuant to a sales contract after having paid the purchase price and that for over 21 years, the family possessed the property and treated it as their own.  Nance testified about how in 1980, she went with her mother to Green Valley Estates to look for a house for the Hampton/Destocki family, they toured the property at issue because it had a "for sale" sign in the yard, and her mother decided to buy it and gave Louise Lively a check the next day.  Even though Nance did not see the face of the check, Destocki testified that his grandmother always purchased things outright with cash or check; it was "how she operated."  See Evid.R. 406 ("Evidence of the habit of a person * * * is relevant to prove that the conduct of the person * * * on a particular occasion was in conformity with the habit * * *").  And even though Thomas and Louise Lively remained the record owners of the property until 2016, Destocki explained that it was possible that his family had a deed to the property that was not recorded out of a desire to protect the property from potential creditors and that was lost because his mother was a hoarder, and Destocki did not have access to the property once Lively became the record owner in 2016.

{¶18} After Louise Lively accepted the check from Leona Hampton, there is no evidence that the Lively family ever sought or received additional payments for the property or of any other interaction between the families during the 32 years Carol Jean

Hampton and her husband resided there. There is no evidence that any member of the Lively family maintained the property or made expenditures on it between 1980 and 2016. There is no evidence Thomas, Louise, or James Lively even returned to the property prior to their deaths. Notably, James Lively moved back to Ohio in 2004 and lived in Ironton for a year before he died in 2007. There is evidence that Louise Lively told a neighboring property owner, Salisbury, that the Livelys had sold the house to Carol Jean Hampton and her husband.[1] There is also evidence that the Hampton/Destocki family treated the property as their own during the time they lived there. They added a garage to the property with the help of Leona Hampton, ensured payment of the property taxes from 1980 through 2015, and had homeowners' insurance on the property.

**{¶19}** Lively directs our attention to his testimony that he observed his grandparents holding themselves out as owners of the property after they moved to Florida and asserts that his grandparents discussed him moving back to the property. However, Lively did not articulate what his observations were and admitted that he had no evidence that his grandparents went to the property, received rent, maintained the property, expended money on it, or communicated with the Hampton/Destocki family after moving to Florida—actions one would expect a property owner to take if there had

---

[1] We recognize that to the extent the Estate relies on this testimony to prove a sale had occurred, the testimony is hearsay, i.e., "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Even though Lively did not object to this testimony, "when the trial court is the trier of fact, we presume that the judge disregards improper hearsay evidence unless there is affirmative evidence in the record to the contrary." *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 & 100247, 2014-Ohio-2181, ¶ 16. However, because Lively did not object at trial or respond to the Estate's reliance on Salisbury's testimony on appeal, we are without the benefit of arguments from the parties as to whether a hearsay exception applies. *See generally* Evid.R. 804(B)(3) ("A statement that was at the time of its making so far contrary to the declarant's * * * proprietary interest * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true" is "not excluded by the hearsay rule if the declarant is unavailable as a witness"); Evid.R. 804(A)(4) (a declarant is unavailable as a witness if the declarant "is unable to be present or to testify at the hearing because of death"). However, even if the testimony was inadmissible hearsay, our conclusion in this case would be the same.

been a landlord/tenant relationship or a sale with unpaid purchase money. Although Lively testified that he believed his grandparents owned the property based on conversations with them and his father, the court indicated that Lively could not testify about what they said, presumably because it would have been inadmissible hearsay. In addition, the testimony Lively cites for the position that his grandparents discussed him moving back to the property is testimony of his wife—who never met his grandparents— about statements that Lively made. Lively had no personal knowledge of the arrangement between his grandparents and the Hampton/Destocki family.

{¶20} The Estate established the elements of its adverse possession claim by clear and convincing evidence. We sustain the sole assignment of error, reverse the trial court's judgment, and remand for further proceedings consistent with this opinion.


                                                              JUDGMENT REVERSED AND
                                                              CAUSE REMANDED.

Abele, J., dissenting:

{¶21} I respectfully dissent.  The trial court determined that appellant did not prove the adversity element of the adverse possession claim.  I agree with the trial court's conclusion.  When the original entry onto another's property is permissive or conferred by grant, any use consistent with such grant or permission is not adverse. *Rodgers v. Pahoundis*, 178 Ohio App.3d 229, 2008-Ohio-4468.  Thus, a person who initially occupies or possesses land with the owner's permission cannot thereafter obtain title by adverse possession unless the owner revokes permission, dies, sells his estate, or the claimant makes an obvious change in the use or other distinct assertion of a right hostile to the owner.  *Remund v. Stroud*, Wash. App. No. 23264-2-11, 1999 WL 512505 (July 16, 1999).  Consequently, I agree with the trial court's conclusion that appellant's adverse possession claim should fail.  Appellant, however, may have had a viable claim to establish title and ownership through an action to quiet title.  If appellant could establish that a lost deed did, in fact, convey title to the real estate and the 1980 transaction involved the exchange of purchase money for a deed, appellant should be the title holder, at least as against all others except for any subsequent purchaser without notice.  A grantor's execution of a deed vests title in the grantee, whether or not the deed is recorded, and is good against all the world except subsequent purchasers without notice.  Thus, a deed need not be recorded to pass title.  Whether or not recorded, an Ohio deed passes title upon proper execution and delivery, so far as the grantor is able to convey it.  See, generally, *Wayne Bldg. & Loan of Wooster v. Yarborough*, 11 Ohio St. 2d 195, 228 N.E.2d 841 (1967).  Thus, a purchaser can

establish the execution and existence of a deed and its contents to enable a court to determine the character of the instrument.

{¶22} In the case sub judice, it appears that some type of transaction occurred in 1980. Also, it appears that no other transactions occurred after 1980 (e.g. subsequent sale to a purchaser without notice). Thus, it is conceivable that appellant could have adduced evidence sufficient to establish the true nature of the original transaction.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE IS REMANDED.  Appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J.: Concurs in Judgment and Opinion.
Abele, J.:  Dissents with Dissenting Opinion.


For the Court



BY: _____
         Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**