**RODGERS, Admr., Appellant,**

v.

**PAHOUNDIS et al., Appellees.**

[Cite as *Rodgers v. Pahoundis,* 178 Ohio App.3d 229, 2008-Ohio-4468.]

Court of Appeals of Ohio,
Fifth District, Coshocton County.

No. 07 CA 0007.

Decided Sept. 2, 2008.

Cynthia M. Rodgers, pro se.

Pomerene Burns & Skelton and James R. Skelton, for appellees.

---

EDWARDS, Judge.

{¶ 1} This matter is on appeal from the trial court's judgment in favor of appellees, George Pahoundis Sr. and the Pahoundis Family Trust, and against appellant, Cynthia Rodgers, as the administrator of the estate of John Pahoundis Sr. In the judgment on appeal, the trial court denied appellant's action seeking an order that an 80–acre tract of farmland was rightfully a part of the estate of John Pahoundis Sr., pursuant to the existence of either a resulting or a constructive trust and/or adverse possession.

## STATEMENT OF FACTS AND CASE

{¶ 2} The parties involved in this action, their relationships, and the matters in dispute are as follows: appellant, Cynthia Rodgers ("Rodgers") is the daughter of John Pahoundis Sr. and the administrator of his estate. John Pahoundis Sr. ("John Sr.") died intestate on July 24, 2003. Appellee George Pahoundis Sr. ("George Sr.") is the brother of John Sr., deceased. Appellee the Pahoundis Family Trust, with George Sr. and Mary Pahoundis (husband and wife) as trustees, is the holder of an 80–acre tract of farmland that is the property in dispute.

{¶ 3} George Sr. holds the duly recorded deed to the 80 acres of property, a.k.a. the 80–acre farm. John Sr., his wife, his children, and his children's families lived on the 80–acre farm from approximately 1979 until 2004, when they were evicted from the property by George Sr. The history of the case is as follows:

{¶ 4} John Sr. died intestate on July 24, 2003. After the death of John Sr., Rodgers opened an estate for her father in the Coshocton County Probate Court. In her capacity as administrator of the estate, she asked George Sr. to transfer the 80–acre farm to John Sr.'s estate. In response, George Sr. refused to transfer the 80–acre farm to the estate.

{¶ 5} Thereafter, on August 20, 2003, George and Mary Pahoundis conveyed the 80–acre farm into the Pahoundis Family Trust by quit-claim deed, with George Sr. and Mary as trustees.

{¶ 6} On October 13, 2004, George Sr. filed a forcible-entry-and-detainer action in Coshocton Municipal Court, seeking to remove John Sr.'s family from the 80–acre farm. On November 2, 2004, the Coshocton Municipal Court issued a writ of restitution in favor of George Sr. and against John Sr.'s family.

{¶ 7} On November 2, 2004, Rodgers, by and through attorneys Samuel Elliot and Craig Eoff, filed an action in the Coshocton County Probate Court against George Sr. and the Pahoundis Family Trust for declaratory judgment, unjust enrichment, constructive trust, resulting trust, breach of fiduciary duty, and adverse possession.[1]

{¶ 8} In the probate complaint, Rodgers stated that on January 15, 1970, John Sr. and Betty Pahoundis purchased the 80–acre farm for $8,500. Thereafter, on May 4, 1977, John Sr. conveyed the 80–acre farm by general warranty deed to his brother George Sr. Rodgers alleged that by oral agreement, George Sr. was to act in a fiduciary capacity and hold the 80–acre farm in trust for the purpose of safeguarding the property for John Sr.'s children until John Sr.'s death. Rodgers also stated that John Sr. and his family had continued to live on the property, maintain the property, and improve the property, thereby establishing adverse possession. Rodgers also claimed that George Sr. had been unjustly enriched by John Sr.'s improvements to the property, including the construction of a steel garage, water wells, and fencing. Finally, Rodgers argued that George Sr. and the Pahoundis Family Trust had received royalties for oil and gas leases on the property that were rightfully part of John Sr.'s estate.

{¶ 9} For these reasons, Rodgers moved the probate court to impose a resulting trust or a constructive trust and to order George Sr. and the Pahoundis

---

1. The record reflects that Rodgers retained several attorneys throughout this case.

Family Trust to transfer the 80–acre farm and oil and gas leases to John Sr.'s estate. In the alternative, Rodgers moved the court to find that John Sr. had acquired the property by adverse possession, thereby making the property and the oil and gas leases assets of John Sr.'s estate.

{¶ 10} On November 30, 2004, George Sr. and the Pahoundis Family Trust filed a joint answer and counterclaim to Rodgers's probate complaint. In the answer, George Sr. and the Pahoundis Family Trust generally set forth denials to the allegations regarding the creation of a constructive or a resulting trust or adverse possession. In the counterclaim, George Sr. and the Pahoundis Family Trust alleged that the property was conveyed by John Sr. to George Sr. as reimbursement for money that John Sr. had borrowed. George Sr. and the Pahoundis Family Trust argued that John Sr.'s debt had exceeded $8,500 and that the brothers had agreed to exchange the 80–acre farm in exchange for cancellation of the debt. The counterclaim further stated that the brothers had agreed that they would record the value of the conveyed 80–acre farm as being $8,500 so that John Sr. would have to pay only a minimal conveyance fee to the county auditor for the property transfer. George Sr. and the Pahoundis Family Trust alleged that as a result of this agreement, the deed transferring ownership of the 80–acre farm from John Sr. to George Sr. reflects payment to the Coshocton County Auditor of a minimal conveyance fee in the amount of $17, for the transfer of property valued at $8,500.

{¶ 11} On December 28, 2004, Rodgers filed an answer to George Sr. and the Pahoundis Family Trust's counterclaim.

{¶ 12} On May 11, 2005, George Sr. and the Pahoundis Family Trust filed a motion for summary judgment against Rodgers. On May 18, 2005, by and through her second attorney, John Woodard, Rodgers filed a response to George Sr. and the Pahoundis Family Trust's motion for summary judgment. On June 1, 2005, the probate court denied Rodgers's motion for summary judgment.

{¶ 13} On June 6, 2005, the probate court determined that the General Division of the Common Pleas Court of Coshocton County, Ohio, had jurisdiction over the issues alleged in Rodgers's complaint filed on November 2, 2004. Counsel for both parties agreed with the probate court's conclusion. Accordingly, by judgment entry, the probate court transferred the matter to the General Division of the Common Pleas Court of Coshocton County, Ohio.

{¶ 14} On June 28, 2006, George Sr. and the Pahoundis Family Trust filed a motion for summary judgment in the general division of the Coshocton County Court of Common Pleas on the same grounds as previously filed in the probate division. On July 11, 2006, new counsel for Rodgers and the estate, Amanda Paar, filed a notice of appearance. Paar had been retained by the appellant solely for the purpose of filing a response to appellees' motion for summary

judgment. On August 6, 2006, after being granted leave of court, Rodgers filed a response to George Sr. and the Pahoundis Family Trust's motion for summary judgment filed on June 28, 2006.

{¶ 15} On September 18, 2006, Rodgers filed a motion for summary judgment. In support, Rodgers attached her own affidavit. Rodgers argued that the estate was entitled to judgment as a matter of law, because there was no question of fact that John Sr. and his family had established exclusive and adverse possession of the 80–acre farm by their residency, maintenance, and use of the property for over 21 years. Rodgers further argued that the evidence established that there was no question of fact that the agreement between John Sr. and George Sr. that resulted in the transfer of the property was not intended to benefit George Sr., but rather was either a resulting trust or constructive trust created by the oral agreement of John Sr. and George Sr. The agreement was that George Sr. would hold the family farm in trust for the benefit of John Sr.'s children upon his death.

{¶ 16} On October 10, 2006, George Sr. and the Pahoundis Family Trust filed a response in opposition to Rodgers's motion for summary judgment. The affidavit of George Sr. was attached in support. The appellees argued that there was a question of fact as to the existence of any resulting trust, constructive trust, and/or adverse possession.

{¶ 17} On October 16, 2006, George Sr. and the Pahoundis Family Trust filed a third motion for summary judgment. Rodgers filed a timely response.

{¶ 18} On November 17, 2006, by judgment entry, the trial court overruled George Sr. and the Pahoundis Family Trust's motions for summary judgment filed on June 28, 2006, and October 16, 2006. The trial court also overruled Rodgers's motion for summary judgment filed on September 18, 2006. The trial court scheduled the matter to proceed to trial on November 28, 2006. By a separate judgment entry, the trial court granted Paar's motion to withdraw as counsel for appellant.[2]

{¶ 19} On November 28, 2006, Rodgers appeared for trial, pro se, on behalf of the estate. After the presentation of evidence on February 8, 2007, the trial court issued a judgment entry in favor of George Sr. and the Pahoundis Family Trust, thereby dismissing Rodgers's complaint for declaratory judgment, unjust

---

2. Rodgers testified that she hired Paar to respond to appellees' motion for summary judgment but had never paid her to appear and handle the trial. She stated, "The day before this trial was to begin, negotiations were still underway with Amanda Paar so that she could handle this matter for us. And it required a $12,000.00 retainer, which we didn't have, but we were working on funding for that. And it fell through. And so I was stuck with handling this or just dismissing it."

enrichment, constructive trust, resulting trust, breach of fiduciary duty, and adverse possession. It is from this judgment that Rodgers now seeks to appeal.

{¶ 20} Rodgers, who is appealing pro se, has set forth 61 assignments of error in her "Statement of Assignment of Error Presented for Review." However, Rodgers has set forth only one argument. Rodgers's merit brief fails to comply with Rule 16 of the Appellate Rules of Procedure. Pursuant to App.R. 16(A)(7), an appellant is required to set forth an argument with respect to "each assignment of error presented for review and the reasons in support of the contention, with citations to the authorities, statutes and parts of the record on which appellant relies." However, upon examination of Rodgers's single "argument," we can infer the following assignments of error:

{¶ 21} "I. The trial court abused its discretion in failing to grant appellant's motion for summary judgment filed September 18, 2006.

{¶ 22} "II. The trial court's final judgment in favor of the appellees and against the appellant is against the manifest weight of the evidence.

{¶ 23} "III. The trial court abused its discretion in failing to admit a box of documents submitted by the appellant.

{¶ 24} "IV. The trial court failed to sua sponte transfer the case to the federal bankruptcy court."

## I, II

{¶ 25} In the first assignment of error, appellant argues that the trial court erred in not granting her motion for summary judgment on the issues of resulting trust, constructive trust, and adverse possession. In appellant's second assignment of error, she argues that the trial court's verdict in favor of the appellees on their counterclaim and dismissing appellant's complaint for resulting trust, constructive trust, adverse possession, breach of fiduciary duty, and unjust enrichment was against the manifest weight of the evidence.

## STANDARDS OF REVIEW

{¶ 26} The standards of review for summary judgment and whether the verdict is against the manifest weight of the evidence are as follows:

{¶ 27} We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays* (2000), 140 Ohio App.3d 1, 746 N.E.2d 618, citing *Smiddy v. Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212; *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.* (1997), 121 Ohio App.3d 188, 699 N.E.2d 534. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether

summary judgment is appropriate. Id. at 192, 699 N.E.2d 534, citing *Brown v. Scioto Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 622 N.E.2d 1153. Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion, which is adverse to the nonmoving party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 28} In reviewing the trial court's verdict, it is axiomatic that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533. Furthermore, in considering whether a judgment is against the manifest weight of the evidence, it is important that this court be guided by the presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. If the evidence is susceptible of more than one interpretation, we must construe the evidence consistently with the trial court's judgment. *Gerijo,* 70 Ohio St.3d at 226, 638 N.E.2d 533.

{¶ 29} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, syllabus 1.

## APPLICABLE LAW

{¶ 30} The law regarding equitable trusts (such as resulting trusts and constructive trusts) and adverse possession is as follows:

{¶ 31} Equitable trusts are commonly divided into two categories: resulting trusts and constructive trusts. *Union S. & L. Assn. v. McDonough*

(1995), 101 Ohio App.3d 273, 655 N.E.2d 426. The burden of proving the existence of a trust rests with the party asserting it. *Hill v. Irons* (1953), 160 Ohio St. 21, 29, 50 O.O. 485, 113 N.E.2d 243. The existence of a trust must be demonstrated by clear and convincing evidence. *Eckenroth v. Stone* (1959), 110 Ohio App. 1, 5, 12 O.O.2d 179, 158 N.E.2d 382. A trial court's decision regarding the existence of a trust will not be reversed when it is supported by some competent, credible evidence going to all the essential elements of the case. *Robbins v. Warren* (May 6, 1996), Butler App. No. CA95–11–200, 1996 WL 227477, citing *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 32} A resulting trust arises when property is transferred under circumstances that raise an inference that the transferor, or the person who caused the transfer, did not intend the transferee to take a beneficial interest in the property. *Bilovocki v. Marimberga* (1979), 62 Ohio App.2d 169, 172, 16 O.O.3d 369, 405 N.E.2d 337, 341. By employing its equitable powers in creating a resulting trust, a court seeks to enforce the parties' intentions. Id.

{¶ 33} In *First Natl. Bank of Cincinnati v. Tenney* (1956), 165 Ohio St. 513, 515–516, 60 O.O. 481, 138 N.E.2d 15, 17, the Supreme Court noted that "[a] resulting trust has been defined as 'one which the court of equity declares to exist where the legal estate in property is transferred or acquired by one under facts and circumstances which indicate that the beneficial interest is not intended to be enjoyed by the holder of the legal title'. * * * The device has historically been applied to three situations: (1) Purchase-money trusts; (2) instances where an express trust does not exhaust the res given to the trustee; and (3) express trusts which fail, in whole or in part. 2A Bogert on Trusts, 405, Section 451." *Bilovocki v. Marimberga,* 62 Ohio App.2d at 171, 16 O.O.3d 369, 405 N.E.2d 337, citing Scott on Trusts (1967), Section 404.2; see also *Univ. Hosps. of Cleveland, Inc. v. Lynch* (2002), 96 Ohio St.3d 118, 129, 2002-Ohio-3748, 772 N.E.2d 105.

{¶ 34} A purchase-money resulting trust occurs "when property is transferred to one person, but the entire purchase price is paid by another." *Glick v. Dolin* (1992), 80 Ohio App.3d 592, 597, 609 N.E.2d 1338, citing Restatement of the Law 2d, Trusts (1959) 393, Section 440, and 5 Scott on Trusts (4th Ed. 1967), Section 440. In such a case, "a resulting trust arises in favor of the person by whom the purchase price is paid." *John Deere Indus. Equip. Co. v. Gentile* (1983), 9 Ohio App.3d 251, 255, 9 OBR 425, 459 N.E.2d 611, citing Restatement of the Law 2d, Trusts (1959), 393, Section 440. Central to the determination of whether a purchase-money resulting trust exists are the issues of (1) who paid for the purchase and (2) who was intended to beneficially enjoy the property. *Cayten v. Cayten* (1995), 103 Ohio App.3d 354, 359, 659 N.E.2d 805, citing *Glick v. Dolin* (1992), 80 Ohio App.3d 592, 597, 609 N.E.2d 1338.

{¶ 35} A constructive trust is a remedial device utilized to prevent fraud and unjust enrichment. *Ferguson v. Owens* (1984), 9 Ohio St.3d 223, 9 OBR 565, 459 N.E.2d 1293; *Bilovocki v. Marimberga*, 62 Ohio App.2d at 171, 16 O.O.3d 369, 405 N.E.2d 337. It is an equitable remedy used "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest." *Ferguson v. Owens*, 9 Ohio St.3d at 225, 9 OBR 565, 459 N.E.2d 1293, quoting *Beatty v. Guggenheim Exploration Co.* (1919), 225 N.Y. 380, 386, 122 N.E. 378; *Cosby v. Cosby*, 96 Ohio St.3d 228, 2002-Ohio-4170, 773 N.E.2d 516.

{¶ 36} "The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it." *Bilovocki v. Marimberga*, 62 Ohio App.2d at 169, 171–172, 16 O.O.3d 369, 405 N.E.2d 337, citing 5 Scott on Trusts (1967), Section 404.2. Unjust enrichment occurs when one person has and retains money or benefits that in justice and equity belong to another. *Liberty Mut. Ins. Co. v. Indus. Comm.* (1988), 40 Ohio St.3d 109, 110–111, 532 N.E.2d 124; *Hummel v. Hummel* (1938), 133 Ohio St. 520, 11 O.O. 221, 14 N.E.2d 923. "Ordinarily a constructive trust arises without regard to the intention of the person who transferred the property." *Bilovocki v. Marimberga*, 62 Ohio App.2d at 171, 16 O.O.3d 369, 405 N.E.2d 337, citing Scott on Trusts (1967), Section 404.2.

{¶ 37} By imposing a constructive trust, a court orders a person who owns the legal title to the property to hold or use the property for the benefit of another or to convey the property to another to avoid unjust enrichment. *Everhard v. Morrow* (Dec. 2, 1999), Cuyahoga App. No. 75415, 1999 WL 1087488. When construing constructive trusts, courts are required to apply the often quoted maxim, "[E]quity regards done that which ought to be done." *Bilovocki*, 62 Ohio App.2d 169, 171, 16 O.O.3d 369, 405 N.E.2d 337.

{¶ 38} A constructive trust will not attach to property acquired by a bona fide purchaser—one who acquires title to property for value. See *In re Bell & Beckwith* (C.A.6, 1988), 838 F.2d 844, 845, citing Restatement of the Law, Restitution (1937) Section 172(1).

{¶ 39} Adverse possession focuses on the acts of the one claiming prescriptive ownership. "Adverse possession is a common law device by which one in unauthorized possession of real property acquires legal title to that property from the titled owner." *Hamons v. Caudill*, Huron App. No. H–07–020,

2008-Ohio-248, 2008 WL 204069, citing 1 Curry and Durham, Ohio Real Property and Practice (5th Ed. 1996) 276.

{¶ 40} Adverse possession focuses on the acts of the one claiming prescriptive ownership and requires proof of exclusive possession and open, notorious, continuous, and adverse use for a period of 21 years. *Grace v. Koch* (1998), 81 Ohio St.3d 577, 692 N.E.2d 1009, syllabus; see also *Pennsylvania RR. Co. v. Donovan* (1924), 111 Ohio St. 341, 349–350, 145 N.E. 479, 482. See also *State ex rel. A.A.A. Invest. v. Columbus* (1985), 17 Ohio St.3d 151, 153, 17 OBR 353, 478 N.E.2d 773, 776; *Gill v. Fletcher* (1906), 74 Ohio St. 295, 78 N.E. 433, paragraph three of the syllabus; *Dietrick v. Noel* (1884), 42 Ohio St. 18, 21. To prevail on a claim for adverse possession, a claimant must establish these factors by clear and convincing evidence. *Grace v. Koch* at 580, 692 N.E.2d 1009. A party who fails to prove any of the elements fails to acquire title through adverse possession. *Grace v. Koch* at 579, 692 N.E.2d 1009; *Pennsylvania RR. Co. v. Donovan*; *Houck v. Huron Cty. Bd. of Park Commrs.*, 6th Dist. No. H–05–018, 2006-Ohio-2488, 2006 WL 1363833, ¶ 12, affirmed 116 Ohio St.3d 148, 2007-Ohio-5586, 876 N.E.2d 1210.

{¶ 41} When the original entry onto another's property is permissive or conferred by grant, then any use reasonably consistent with such a grant or permission is not adverse. *Heggy v. Lake Cable Recreation Assn.* (Dec. 15, 1977), Stark App. No. CA 4704, 1977 WL 201024; see also *Kelley v. Armstrong* (1921), 102 Ohio St. 478, 132 N.E. 15. "If a claimant's use of the disputed property is either by permission or accommodation for the owner, then it is not 'adverse,' for purposes of establishing adverse possession." *Coleman v. Penndel Co.* (1997), 123 Ohio App.3d 125, 703 N.E.2d 821, paragraph three of the syllabus.

{¶ 42} The party claiming title by adverse possession must establish a prima facie case of adverse use before the alleged owner is required to rebut the claim. *Goldberger v. Bexley Properties* (1983), 5 Ohio St.3d 82, 84, 5 OBR 135, 448 N.E.2d 1380. However, if the owner of the property in question claims that the use was permissive, the owner has the burden of proving it. *Pavey v. Vance* (1897), 56 Ohio St. 162, 46 N.E. 898.

{¶ 43} Each case of adverse possession rests on its own peculiar facts. *Bullion v. Gahm*, 164 Ohio App.3d 344, 349, 2005-Ohio-5966, 842 N.E.2d 540, citing *Oeltjen v. Akron Associated Invest. Co.* (1958), 106 Ohio App. 128, 130, 6 O.O.2d 399, 153 N.E.2d 715. Failure of proof as to any of the elements results in failure to acquire title by adverse possession. *Pennsylvania RR. Co. v. Donovan*, 111 Ohio St. at 349–350, 145 N.E. at 482.

ANALYSIS

{¶ 44} A. Summary Judgment.

{¶ 45} In the case sub judice, on September 18, 2006, Rodgers filed a motion for summary judgment on the issues of the existence of either a resulting trust (purchase money) or constructive trust by unjust enrichment and/or adverse possession. In the motion, Rodgers stated that John Sr. and his wife Betty purchased the 80–acre farm on January 15, 1970, for the price of $8,500 and financed the entire purchase through Baltic State Bank. Rodgers argued that on November 15, 1975, John Sr. paid off the mortgage and held the property in fee simple. Rodgers stated that on May 4, 1977, John Sr. and Betty transferred the property to George Sr. to act in a fiduciary capacity and hold the farm in trust for John Sr.'s family and to protect the property from financial liability.

{¶ 46} In support, Rodgers attached her own sworn affidavit. In the affidavit, Rodgers stated that her father (John Sr.) and George Sr. entered into a oral agreement whereby they both agreed that George Sr. would hold the 80–acre farm in trust for the benefit of John Sr.'s children and that in the event of John Sr.'s death, George would convey the farm outright to John Sr.'s children.

{¶ 47} In the sworn affidavit, Rodgers also stated that John Sr. and his family lived on and operated the 80–acre farm from 1979 until 2003. She stated that John Sr.'s family logged the farm and kept the proceeds of the logging, used the land to store miscellaneous junk and old automobiles, farmed the land for their own personal use, raised horses for horse racing on the land, built a steel garage wherein John Sr.'s children did auto repairs, dug water wells, and installed a septic system for the numerous family members who had brought their mobile homes onto the property. She stated that all these activities occurred in an open and notorious manner, were adverse to George Sr.'s claim of ownership, occurred without the permission of George Sr., and were continuous for a period of more than 21 years.

{¶ 48} Rodgers argued that the estate was entitled to summary judgment as a matter of law because there was no question that John Sr. and his family had established exclusive and adverse possession of the 80–acre farm by their residency, maintenance, and use of the property for over 21 years. Rodgers further argued that the evidence established that there was no question of fact that the oral agreement between John Sr. and George Sr. that resulted in the transfer of the property to George Sr. was not intended to benefit George Sr., but rather was intended to bestow on George Sr. a fiduciary duty to hold the farm in trust for the benefit of John Sr.'s children. Finally, appellant argued that the facts established that if George Sr. and the Pahoundis Family Trust were

permitted to keep the 80–acre farm, they would be unjustly enriched by the improvements to the property made by John Sr. and his family.

{¶ 49} On October 10, 2006, George Sr. and the Pahoundis Family Trust filed a response in opposition to Rodgers's motion for summary judgment. In support, the appellees attached the sworn affidavit of George Sr. In the affidavit, George Sr. stated that he had loaned John Sr. money "various times" during John Sr.'s life, in an amount in excess of $8,500. He stated that on May 4, 1977, he agreed to accept the 80–acre farm as full payment for John Sr.'s loan debts in excess of $8,500 and that John Sr. and his family moved off the property to make a new start. He stated that after the transfer, John Sr. and his family suffered financial hardship, and he gave John Sr. permission to move back onto the 80–acre farm with his family. As a result, appellees argued that there was a question of fact as to the existence of any oral agreement, a resulting trust, a constructive trust, and/or adverse possession.

{¶ 50} On November 17, 2006, by judgment entry, the trial court overruled Rodgers's motion for summary judgment.

{¶ 51} Upon de novo review, we find that the conflicting affidavits of Rodgers and George Sr. created questions of material fact as to whether valuable consideration was provided by George Sr. to John Sr. for the transfer of the 80–acre farm, as to the intentions of John Sr. and George Sr. regarding the transfer, and as to whether John Sr.'s family had adversely possessed the 80–acre farm for more than 21 years. For these reasons, we find that the trial court did not err in denying appellant's motion for summary judgment.

{¶ 52} B. Verdict.

{¶ 53} With regard to the trial court's verdict, the record before the trial court was as follows:

{¶ 54} During the trial, the appellant presented the testimony of the following witnesses: George Pahoundis as on cross, Jeffrey Pahoundis, Julius Pahoundis, Jerry Duane Pahoundis, Joseph Pahoundis, and Deborah Pahoundis Beamer. Rodgers testified on her own behalf.

{¶ 55} Jeffrey Pahoundis ("Jeffrey"), the son of John Sr., testified that for over three years, he had participated in building a steel garage that he guessed was worth approximately $3,000 and had helped drill water wells on the 80–acre farm. He testified that he and his family had a camper and had lived on the 80–acre farm. He testified that his father raised six thoroughbred horses on the property and had other animals on the farm. He stated that the family had approximately 30 junk cars sitting around the farm, because his dad kept the junk cars for parts. He testified that all these activities occurred without George Sr.'s permission.

{¶ 56} On cross-examination, Jeffrey testified that the Coshocton County Treasurer's records showed that the steel garage had increased the value of the 80–acre farm by only $30 and that the taxable value of all the buildings on the farm was approximately $620. He testified that when his father (John Sr.) asked him to participate in building the steel garage, he told his dad that he didn't want to put the building up because the farm wasn't in his dad's name. He testified, "I told my dad I didn't want to put the garage up because the farm was in George's name. Therefore, if we put the garage up, anything happens to dad, we lose the garage and everything." He further testified that George Sr. participated in the placement of the lean-to for the horses and may have also helped construct the steel building.

{¶ 57} Julius Pahoundis ("Julius"), the son of John Sr., testified that he moved to the farm with his parents in 1979. He testified that he helped build a lean-to and a steel garage on the 80–acre farm and that his father raised horses on the farm.

{¶ 58} Jerry Duane Pahoundis ("Jerry"), the son of John Sr., testified that he lived in a mobile home on the 80–acre farm without George Sr.'s permission and worked on cars in the steel garage before he became disabled. He testified that he helped build the steel garage and contributed bolts, nuts, and washers to the project. He testified that the family accumulated a lot of junk cars on the property. He testified that the family had a garden on the farm and raised oats for the horses. He testified that he helped build the lean-to for the horses and that his Uncle George (George Sr.) came by and said that he would have helped to build a pole barn. He testified that his dad would go to the horse races in West Virginia and bet money. He testified that he went with his dad one time to pay taxes on the farm and remembered that his dad worked to get the taxes lowered because the property was being used in part for agricultural purposes. He testified that in 2000, his dad was upset because the treasurer's office filed a foreclosure action against the farm for back taxes, and his dad got the money to keep the farm from being sold. He testified that he and Charles (George Sr.'s son), got into an argument because Charles thought it wasn't fair that he (Jerry) could live on the property for free when George Sr. owned the property and paid all the taxes.

{¶ 59} On cross-examination, Jerry testified that his father and grandfather made repairs to an old farm house on the property, but before they could move in, the farmhouse burned down and they had to move to a different location. He testified that the department of human services became involved with the family, and in 1973, he and his brothers and his sisters were removed from his parents' care and were placed in foster care. He testified that by 1978, his father managed to get all the children returned to his custody.

{¶ 60} Joseph Pahoundis ("Joseph") testified that when he lived on the 80–acre farm, he brush-hogged the property, mowed grass, cut down trees, and dug ditches for the driveway. He testified that he put up no-trespassing signs on the property. He testified that he had a mobile home on the farm without George Sr.'s permission. He testified that he helped put up the steel building and contributed money to cover the costs of the steel building. He testified that shortly after his father passed away, the family received a letter from George Sr. with a proposal that the children keep 40 acres and sell 40 acres of the farm and divide the money.

{¶ 61} On cross-examination, Joseph admitted that he had been convicted of felony drug trafficking, receiving stolen property, and breaking and entering. He testified that he gave his dad money all the time. He testified that he had known since he was a little boy that George Sr. owned the 80–acre farm.

{¶ 62} Deborah Pahoundis Beamer ("Deborah"), testified that prior to being disabled in a car accident, she worked at a rehabilitation center for the deaf and visually impaired. She testified that she had a mobile home on the 80–acre farm and that she hunted and dumped junk cars on the property without George Sr.'s permission. During the testimony, Rodgers presented Deborah with a stack of documents labeled plaintiff's "Exhibit 14," which Deborah testified appeared to include some receipts, bills, handwritten notes, pay stubs, and a request for unclaimed funds prepared by John Sr. She testified that the family drilled a water well near her trailer. She testified that when she needed bail money for a criminal charge, her father and George Sr. used the farm as collateral.

{¶ 63} On cross-examination, Deborah testified that when the farm was used as collateral for the bail, George Sr. signed the bond. She testified that she has known that the farm was in George Sr.'s name for years. She testified, "It's no big mystery, it's common knowledge."

{¶ 64} Finally, Rodgers took the stand on her own behalf and testified that her father, John Sr., had started working at Midland Ross in January 1983 and was a member of the United Auto Workers. She testified that she found a check issued to her father by East Ohio Gas for a gas lease and that no one else has claimed the royalties on the gas lease. She testified that her father took out a loan in 1970 with Baltic State Bank for $9,000 to purchase the property for $8,500. She testified that her father, prior to his death, told her that George Sr. had used the farm as collateral to build a $167,000 home but that the amount had been paid off. She testified that prior to her father's death, they visited an attorney to discuss putting the 80–acre farm in a trust. She testified that after her father died, she was presented with George Sr.'s proposal regarding the farm. She testified that she contacted George Sr. and told him that her dad did not want the farm sold, but that he wanted it in trust. She testified that she had been told by her father

that the boys were getting into trouble and that the farm had to be put in George Sr.'s name for protection. She testified that various documents indicated that her father could borrow or use property for collateral if he needed money and that he did not need to borrow money from George Sr.

{¶ 65} On cross-examination, Rodgers testified that in 1964, her parents gave custody of their 11 children to various relatives. She testified that she was ordered to live with George Sr. and his family. She testified that in 1965, she was reunited with her parents and resided with them until 1973. She testified that her father worked at Midland Steel in 1973 and 1974 and that he earned approximately $191 a week. She testified that in July 1973, she again was removed from her parents' custody by children's services for neglect and placed in a receiving home in West Lafayette. She testified that in September 1973, her father made a $4,000 payment on the 80–acre farm, but she was not aware of the source of the money. She testified that she never returned to the farm. She testified that the taxes would come in George Sr.'s name and that her father would pay the taxes. However, she was not able to produce any evidence to show that her father had actually made any tax payments on the 80–acre farm. After the conclusion of her testimony, Rodgers rested her case pending the admission of her exhibits.

{¶ 66} In their case in chief, George Sr. and the Pahoundis Family Trust presented the testimony of Sandra Corder, Michelle Damer, and John Paul Pahoundis. George Sr. testified on his own behalf.

{¶ 67} Sandra Corder testified that she is the County Auditor for Coshocton County. Corder authenticated a copy of a warranty deed filed in the auditor's office on May 12, 1977. She testified that it was a deed from John Pahoundis as grantor to George Pahoundis as grantee. She testified that a conveyance fee is based on the purchase price of the property. She testified that the deed in this case indicated that the payment of the conveyance fee on the 80–acre farm was $17. She stated that in 1977, the conveyance fee was $2 per thousand, meaning that the cost of the property was $8,500. She testified that at the time of the conveyance, it was possible to arrange to transfer property from one party to another in trust without paying a conveyance fee. She stated that this particular transaction would have qualified for a waiver of a conveyance fee to the grantor (John Sr.), but that a trust waiver had not been requested or prepared by the lawyer who handled the conveyance.

{¶ 68} Michelle Darner from the Coshocton County Treasurer's Office testified that as standard policy, real estate tax bills are mailed to property owners. She identified defendant's "exhibit A" as being a contractual agreement between George Sr. and the Coshocton County Treasurer's Office to pay delinquent taxes on the 80–acre property. She further testified that since 1987, she had numerous

conversations with George Sr. regarding delinquent taxes and had expected and waited for George Sr. to come to the Treasurer's Office to pay the delinquent property taxes on the 80–acre farm. She testified, on cross examination, that in 2004, the tax value of the 80–acre farm was $167,050.

{¶ 69} John Paul Pahoundis, the son of George Sr. and Mary Pahoundis, testified that he runs an oil, gas, and water well rig business. He testified that he drilled a water well on the 80–acre farm at no charge to John Sr. He also testified that George Sr. and his family rarely went to the farm because John Sr.'s family was always in trouble.

{¶ 70} George Sr. testified that he gave John Sr. financial assistance through-out John Sr.'s life. He testified that John Sr. had a difficult time supporting 11 children, his race horses, and the gambling habits of himself and his wife. He stated that in 1970, he loaned John Sr. $2,000 to $3,000 to purchase the 80–acre farm but that John Sr. used the money to buy a tractor. He testified that in 1973, he loaned John Sr. $4,000 so that he could get his life back together and get his children back from human services. He testified that he gave John Sr. various cars and trucks.

{¶ 71} George Sr. testified that John Sr. and his wife Betty decided that they would transfer the 80–acre farm to him by deed as compensation for the money they had borrowed from George Sr. He testified that John Sr. and his wife also wanted a place to live for the rest of their lives and that he told them he would provide that for them. He testified that John Sr. told him that he could do what he wanted with the farm after his death and that his children would be all right. He testified that John Sr. never asked him to put the farm in trust for his children.

{¶ 72} George Sr. also testified that John Sr. contacted him and asked him for permission to move onto the farm and to remove timber. He testified that he gave John Sr. permission to move back with his family and timber the land and that he never took any money from John Sr. for the timber. He testified that he was aware that John Sr. was erecting buildings on the property and had even helped with the construction. He testified that he was aware that John Sr. was keeping horses on the property and that he would often have to help care for the horses and helped build the lean-to to house the livestock.

{¶ 73} George Sr. testified that John Sr. asked him whether they could get oil and gas leases on the property in order to obtain free gas. He stated that he agreed to John Sr.'s obtaining the oil and gas leases, but that they were never able to drill wells on the property. He testified that he knew John Sr.'s children were on the property and that he didn't consider them to be trespassers.

{¶ 74} George Sr. testified that he used vegetables from the farm's garden at his restaurant and that he had used the farm as collateral for a mortgage and to post bond for his niece. He testified that he leased the property for farming but that the relationship with the local farmers lasted only a year because their tools and equipment were stolen from the land. Finally, he testified that he paid all the taxes on the 80–acre farm.

{¶ 75} Upon review, we find that there was competent, credible evidence to establish that George Sr. accepted the 80–acre farm as compensation for John Sr.'s outstanding loans in excess of $8,500. The evidence also established that once the transfer was complete, George Sr. received the real estate tax statements, was recognized by the County Treasurer's Office as being the owner of the property, paid the real estate taxes, and made arrangements with the Treasurer's Office to make up for any arrears in the real estate taxes. George Sr. also exhibited ownership and used the property to his benefit by using the property as collateral for bail for John Sr.'s daughter and by signing the bail papers and by using the property as collateral for his new home.

{¶ 76} Furthermore, we do not find that the evidence established that George Sr. would be unjustly enriched. The evidence established that the changes to the property were either detrimental, such as the dumping of junk and cars, or financially minimal, such as erecting structures that added little value to the property. Thus, we find that the trial court did not err in finding that Rodgers failed to establish by clear and convincing evidence the existence of either a resulting or constructive trust.

{¶ 77} The evidence further established that George Sr. gave John Sr. and his family permission to live on the 80–acre farm. George Sr. promised John Sr. that he would always have a place to live. As a result, when John Sr. and his family were reunited and had very little income and no place to live, George Sr. kept his promise and gave John Sr. and his family permission to live on the 80–acre farm. George Sr. testified that he did not consider his brother and family to be trespassers. George Sr. also gave John Sr. permission to log the property and keep the proceeds and to seek both oil and gas leases. John Sr.'s children testified that they knew the property belonged to George Sr., stating that it was "common knowledge." Jeffrey testified that he didn't want to help his dad (John Sr.) erect a steel building on the 80–acre farm because he knew that the land did not belong to his dad and he was worried that if anything happened to his father, they would lose the building. For these reasons, we do not find that the trial court erred in finding that Rodgers failed to establish by clear and convincing evidence title by adverse possession.

{¶ 78} Accordingly, appellant's first and second assignments of error are not well taken and are hereby overruled.

### III

{¶ 79} In the third assignment of error, appellant argues that the trial court erred in denying the admission of her miscellaneous exhibits.

{¶ 80} Appellant states in her brief that the trial court erred in failing to admit the "original carbon copy" of the 1975 Shroyer/JD Pahoudis Purchase agreement and a box of original documents that included personal checks dating back to the 1960s, certificates of registration for 30 horses, survey drawings dated 1973 from Stewart surveying, account records, receipts and purchase agreements, and an original check dated May 1972 for gravel used to make the oil drilling rig road.

{¶ 81} Appellant, in her brief, further argued that "[t]he photos from John Sr.'s mobile home and the financial records in the Admin.'s possession also showed improvements which included the water well that John Sr. a check paid to Marc A. Pahoundis, an employee of Buckeye Union Drilling which J.P. Pahoundis testified he owned." [sic] Appellant also argued in her brief that the trial court should have admitted into evidence "a certified certificate which would have been evidence that George Sr.'s marriage was not legal," as well as a "marriage certificate to show that John Daniel Pahoundis Sr. had married Betty Pahoundis twice, once in 1956 and again in 1974."

{¶ 82} The record reflects that after the close of her case, appellant moved for the admission of 23 exhibits. Appellees objected to the introduction of several exhibits. The trial court then addressed each exhibit individually. The following colloquy took place with regard to the exhibits that were not admitted.

{¶ 83} "Court: We will discuss the exhibits one at a time. Ms. Rodgers, why should Plaintiff's exhibit 1 be admitted notwithstanding the objection?

{¶ 84} "Rodgers: * * * it was. One of the original documents attached to the original complaint.

{¶ 85} "Court: 1 is denied admission. 2 appears to be an oil and gas lease. * * *

{¶ 86} "Rodgers: Same reasons.

{¶ 87} "Court: Plaintiff's 2 is denied admission. Plaintiff's 3 appears to be a document entitled purchase contract, dated October 10, 1975. * * * Why should it be admitted?

{¶ 88} "Rodgers: That was in my possession as a part of being the administratrix of the estate. And I have the original if the court would like it. I'm not sure

what was provided in discovery, but mentioning the terms that were relevant to the case of the contract were referenced in one of the affidavits that were filed.

{¶ 89} "Court:  The Court finds insufficient identification of Plaintiff's Exhibit [3] to authorize its admission.  Admission to Plaintiff's exhibit 3 is denied. Plaintiff's exhibit 4 is a multi page document.  The first page of which says Ohio Division of Geological Survey.  * * * The fifth page, in fact, appears to be some sort of unidentified, out-of-court hearsay statement.  Why should plaintiff's exhibit 4 be admitted?

{¶ 90} "Rodgers:  Were those the Crawford Township Wells?

{¶ 91} "Court:  It does mention Crawford Township, yes.  1 is identified as Limbacher—one not identified—one contains the name Limbacher, one contains the name Stein, one contains the name Lorenz, one contains the name Dent Thomas.

{¶ 92} "Rodgers:  Those were within the packet that was given to Mr. Skelton at the 2004 eviction proceedings.  They were things that I came across in the—in my duties as administratrix of the estate in this investigation.

{¶ 93} "Court:  The admission of Plaintiff's exhibit 4 is denied.  * * * [3]

{¶ 94} "Court:  * * * Plaintiff's 10 is a 12–page document, appears to be a series of digital colored photographs of various parts of the property in question. You object to Plaintiff's 10, to each of the photographs in Plaintiff's 10, Mr. Skelton?

{¶ 95} "Skelton:  Yes * * *.

{¶ 96} "Court:  The objection to Plaintiff's 10 is sustained.  They are of questionable relevance and probative value.  There was no testimony at all about whether they constituted fair and accurate representations of what they purported to show and that's a fundamental basis for the admission of photographs. 10 is denied.  Plaintiff's 11 is a truly multiple page document.  I have no idea how many pages are in there, but I would guess there to be in excess of 100.  It's about a half an inch thick.  And the outside document appears to be a photocopy of front and back of a check drawn on the account of John D or Betty Pahoundis to Deep Rock Manufacturing, July 19[th], 1990, $373.  Mr. Skelton I take it you are objecting to all pages of Plaintiff's 11;  is that correct?

{¶ 97} "Skelton:  That's correct, your honor.

{¶ 98} "Court:  Ms. Rodgers, why should Plaintiff's 11 be admitted notwithstanding the objection?

---

**3.**  Plaintiff's exhibits 5 through 9 were admitted without objection.

{¶ 99} "Rodgers: The majority of those pages in that document are pages that have to do with the many horses that are on the horse farm as part of the adverse possession that shows continuing use of the property as a horse farm and that those horses were owned by John Pahoundis and those documents from the jockey club out of New York are, I believe, copies of official registration of those horses.

{¶ 100} "Court: Plaintiff's 11 in its entirety is denied admission. They were not properly identified and their relevance is not immediately clear.[4] * * *

{¶ 101} "Court: * * * Plaintiff's exhibit 14 is, again, a large stack of documents, better than a half inch thick. The outside document appears to be an invoice from Carter Lumber with a date which is really difficult to read but may be December 29th, 2001. * * * Why should the contents be admitted?

{¶ 102} "Rodgers: Those pages of the packet were some of the same pages that were shown to the defendant at his deposition in which her didn't—in which he stated he had stated he did not know why John would be buying all that sand and gravel at that time. And that was the time in which the steel garage was being constructed.

{¶ 103} "Court: Plaintiff's 14 is denied admission. The documents are insufficiently identified or authenticated and of undemonstrated relevance. Plaintiff's exhibit 15 is a four-page document, the outside of which appears to be a photocopy of a check. Again, it's Deep Rock Manufacturing to John or Betty Pahoundis August 10, 1993, $32. Plaintiff's 15 looks like a legal ad or part of a legal ad, and I'm not sure what the other pages are. * * * Why should 15 be admitted * * *?

{¶ 104} "Rodgers: The notice that is on Page 2 of that is a notice that was required by the courts to be filed in the newspaper to notify all parties who might be interested in that property, which is the parcel in question here, as part of 00–CI either 207 or 211, which were both being handled in that—at the same period.

{¶ 105} "Court: Admission of Plaintiff's 15 is denied. The documents are insufficiently identified or authenticated. Plaintiff's 16 appears to be a transcript of proceedings in a trial to the court before Judge David Hostetler of the Coshocton Municipal Court October 26th, 2004. In part, and then there are other documents attached to the back of the transcript, including an Els Court Reporting Services invoice, a copy of a temporary restraining order from a case in probate court, perhaps this case, but it is not signed or filed, a plaintiff's

---

4. Plaintiff's exhibit 12 was admitted over objection, and plaintiff's exhibit 13 was admitted without objection.

motion for temporary restraining order and an affidavit. * * * Why should 16 be admitted?

{¶ 106} "Rodgers: That is the transcript that was provided by the court reporter, Lynn Els, for the appeal that was filed in the Fifth District Court of Appeals concerning that case and counterclaim of the case exceeded the jurisdiction of municipal court and then was transferred to this court and scheduled for a bench trial in December of 2005, prior to George Pahoundis dismissing the claim.

{¶ 107} "Court: 16 is denied admission. 16 is not a self-authenticating document. It has not been adequately identified or authenticated and its relevance is not clear. 17 appears to be a photocopy of something called mortgage loan record book, Baltic State Bank. * * * admission 17 is denied. The document is obviously a copy and is inadequately identified. 18 appears to be—perhaps an original mortgage loan record book Baltic State Bank. * * * Why should 18 be admitted?

{¶ 108} "Rodgers: At the time those documents were hand stamped each time someone came in to make a payment, and it shows that the person possessing the book would have been the one going in to make get the stamp in person. And it's original that I found in my father's files on the farm.

{¶ 109} "Court: What leads you to conclude that the document, as you say, indicates who actually carried the money in?

{¶ 110} "Rodgers: Because when you go in, they stamp it and so whoever is taking in the money would have that with them.

{¶ 111} "Court: Admission of Plaintiff's 18 is denied. There is no testimony supporting the assertion. The document is inadequately identified. It is inadequately authenticated and it has no apparent relevance. 19 appears to be a facsimile cover sheet from Frontier Power and a letter to Cynthia Rodgers from Marty Shroyer, representative Frontier Power. Mr. Skelton, you object to 19, both the cover sheet and attached letter?

{¶ 112} "Skelton: Yes, Your honor.

{¶ 113} "Court: For the standing reasons and perhaps it would be hearsay?

{¶ 114} "Skelton: That would be correct.

{¶ 115} "Court: 19 is denied admission. 20 is again, a multi-page document. Very cumbersome to deal with documents that are in multiple pages because some parts may require different rulings. This appears to be 20 or 30-page document. The outside page says Department of Health, Coshocton County. And includes within the documents attached though is something called Dave's 80 acre farm formerly owned by John. * * * why should Plaintiff's Exhibit 20 be admitted notwithstanding the objection?

{¶ 116} "Rodgers: The document from the Department of Health was provided to the defendant at his deposition, and he testified concerning that document.

{¶ 117} "Court: That would somehow make it admissible at this trial without further authentication in your view? The admission of Plaintiff's Exhibit 20 is denied. Plaintiff's Exhibit 21 appears to be a sworn affidavit; a statement to the Coshocton County Sheriff's Department, the statement is of Jerry D. Pahoundis. It looks like it was notarized and dated October 5, 2005 by Mary Fritz.  * * *  why should 21 be admitted notwithstanding the objection?

{¶ 118} "Rodgers: Because it's a notarized affidavit.

{¶ 119} "Court: Plaintiff's 21 is denied admission. Plaintiff's 22 is, again, a multi-page document, at least eight pages, having something to do with Frontier Power, billing system inquiries, connect orders, an invoice for something, and what appears to be some sort of map or drawing.  * * *

{¶ 120} "Court: 22 is denied admission. There was no identification or authentication for 22 from any source. 23 is a multi-page document, appears to be some 30 pages or so. The first page is a letter on the head—a letter with the name Midland Steel Products Company across the letterhead and then a series of documents relating, I believe, generally speaking, to the income of John Pahoundis.  * * *  why should 23 be admitted not withstanding the objection?

{¶ 121} "Rodgers: Because those were copies of the originals that I had in his documents and also because I was questioned on the stand concerning those documents.

{¶ 122} "Court: Admission of Plaintiff's 23 is denied. The documents are not adequately authenticated or identified and their relevance is not immediately clear."

{¶ 123} This court further notes that the only witness who examined documents during Rodgers's case in chief was Deborah Pahoundis Beamer. Deborah examined "Exhibit 14" and testified that it appeared to include some receipts, bills, handwritten notes, pay stubs and a request for unclaimed funds. Deborah did not authenticate the documents or express any knowledge regarding their identity or content.

{¶ 124} A condition precedent to the admissibility of documents is that documents must be authenticated or identified. *St. Paul Fire & Marine Ins. Co. v. Ohio Fast Freight, Inc.* (1982), 8 Ohio App.3d 155, 157, 8 OBR 213, 456 N.E.2d 551. "Generally, authentication or identification is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. at paragraph three of the syllabus; Evid.R. 901(A). "The common

manner of identifying a document is through testimony of a witness with knowledge." *St. Paul Fire & Marine,* at paragraph four of the syllabus.

{¶ 125} In this case, Rodgers sought to introduce numerous documents at the close of her case. No witnesses were called to identify or authenticate the documents. The documents appear to have simply been presented for admission. Therefore, upon a review of the record, we find that the documents were not properly introduced, identified, or authenticated by any person with knowledge of their character or content. For these reasons, the trial court did not abuse its discretion in sustaining the appellees' objection to their admission for consideration by the trial court. Accordingly, appellant's third assignment of error is not well taken and is hereby overruled.

## IV

{¶ 126} In the fourth assignment of error, appellant argues that the trial court erred in failing to change the venue of the case to the Federal Bankruptcy Court. Specifically, in her brief, she states, "[S]ince Geo. States that he had knowledge that John Sr. had sought federal bankruptcy protection, this case should have been removed to federal bankruptcy court," citing 76 American Jurisprudence 2d (2005) 695, Trusts, Section 710. This argument is without merit.

{¶ 127} It is well established that issues raised for the first time on appeal are not reviewable. See *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099. An issue otherwise waived because of a failure to object may be brought up on appeal only through the doctrine of plain error. Id. In civil appeals, "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Id. at syllabus.

{¶ 128} In this case, there was no evidence presented in pretrial pleadings or during the trial that John Sr. sought federal bankruptcy protection, and appellant has failed to provide any citations to the record as to where such an issue was raised in the trial court. Additionally, there is nothing on the record to suggest that federal bankruptcy court would have jurisdiction over this matter. Furthermore, the record establishes that appellant never requested that the matter be transferred for any reason to federal bankruptcy court.

{¶ 129} For these reasons, this argument is not reviewable on appeal. Accordingly, appellants fourth assignment of error is not well taken and is hereby denied.

{¶ 130} The judgment of the Coshocton County Court of Common Pleas is hereby affirmed.

Judgment affirmed.

FARMER, P.J., and DELANEY, J., concur.